

IN THE CIRCUIT COURT FOR
MONTGOMERY COUNTY, ALABAMA

THEODORE DAVIS,                              )
                                             )
    Plaintiff,                           )
                                             )
                                             ) Case No. CV-2004-370
                                             )
ARMSTRONG RELOCATION, LLN., et al.,          )
                                             )
    Defendants.                          )

## DEFENDANT EDNA DUMAS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW Edna Dumas by and through her attorney and files this Memorandum in Support of Defendant's Motion for Partial Summary Judgment:

### PRELIMINARY STATEMENT

On or about February 10, 2004, Plaintiff Theodore Davis filed his Complaint in this action, alleging Breach of Contract, Abuse of Process, Fraud, Unlawful Detainer, Wrongful Eviction, Slander, Violation of Civil Rights, False Imprisonment and/or Conversion.  Defendants named in this action were Armstrong Relocation, LLN; Edna Dumas; Unknown Police Officer and fictitious parties A, B and C.  Defendants Armstrong Relocation and Edna Dumas timely answered the Complaint and filed Motions to Dismiss to which Plaintiff Davis filed an Objection to Defendant Armstrong's Motion to Dismiss.  The Defendants' Motions to Dismiss were denied.

On April 28, 2004, Defendant Dumas filed a Motion for Partial Summary Judgment and moved this Honorable Court to dismiss any of Plaintiff's claims to title or possession of the property in question at 207 Rosedon Drive in Montgomery County (herein referred to as "property").[1]

A hearing has been set for July 15, 2004, before this Honorable Court to hear arguments regarding Dumas' Motion for Partial Summary Judgment. This Memorandum is submitted to be considered at the July 15, 2004, hearing along with oral arguments.

## STATUTE OF FRAUDS

Defendant Dumas asserts that there exists no contract, agreement or bill of sale evidencing any of Plaintiff's claims to title of the property. (*See Affidavit of Edna Dumas, dated April 20, 2004,* ¶3 attached hereto and incorporated herein by reference as *Exhibit "A."*) According to Ala. Code §8-9-2, the following agreements are void unless such agreement or note is in writing and subscribed by the party to be charged "...(1) Every agreement which, by its terms, is not to be performed within one year from the making thereof; and (5) Every contract for the sale of lands, tenements or hereditaments, or any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof is paid and

---

[1] The property at 207 Rosedon Drive was sold by Defendant Dumas on April 6, 2004, to a party unrelated to this action. The equity from the April 6 sale is being held in an escrow account of closing attorney Lanier Branch until such time as the claims to ownership of the property asserted by Plaintiff Davis are resolved.

2

the purchaser is put in possession of the land by the seller." *Id.* The Plaintiff has not produced any written document or contract between he and Defendant Dumas for the purchase of the property. Nor has the Plaintiff produced any witness to testify as to the existence or execution of a contract. Further, the Plaintiff admits that no such deed existed naming him as owner of the property. (See Davis Deposition

p. 12

Q. "At any time have you ever received a deed to the premises located on Rosedon?

A. No.")

In the event the Plaintiff asserts that he and Defendant Dumas entered into an oral agreement for the purchase of the property, that claim, too, must fail. Not only does Defendant Dumas deny the existence of a written or oral agreement for the purchase of the property, but such an oral agreement would not have been recognized as valid. "The Statue of Frauds prevents enforcement of an oral agreement concerning the sale of land, even though both parties may acknowledge the existence of the agreement." *Casey v. The Travelers Insurance Company*, 585 So. 2d 1361, 1363 (Ala. 1991), citing *Smith v. Smith*, 466 So. 2d 922, 924 (Ala. 1985). "The single exception which will withdraw a parol contract for the sale or lease of land from the operation of the statue is, when the purchase money, or a portion

3

thereof, is paid, and the purchaser is put in possession by the seller." *Smith v. Smith*, 466 So. 2d 922, 924 (Ala. 1985) citing *Heflin v. Milton*, 69 Ala. 354, 357 (Ala. 1881).    In *Jones v. Jones*, the Alabama Supreme Court stated "...the possession must be referable to the promise and not to some domestic relationship of the vendor and vendee." *Jones*, 219 Ala. 62, 121, So. 78 (1929).

Any of the Plaintiff's argument regarding part performance, should he assert such a claim, likely must fail.  Even though Mr. Davis will be able to establish possession, he was unable to establish that he made a consistent pattern of payments toward the purchase of the property nor that he paid any substantial amount of money to Ms. Dumas toward the purchase of the property.  (See Davis Deposition pp. 15, 16

"...I didn't have a whole big income coming in, so every time I got a good amount of money coming in, she would either come here and visit me or I'd visit her, and I would give her a certain amount of money."

p. 19

"Oh, no.  No, I didn't pay her each month.  No.  We had arranged that I would pay her whenever I saw her.  I would give her, you know, cash."

p. 22

"Like I said, I don't know exactly how much I paid each year, but I did give her quite a bit whenever I would give it to her.  We never kept records of any of it."

4

P. 136

"Well, you know, up until that time, I wasn't even keeping up with how much money I had paid or anything.").

## PART PERFORMANCE

"To take a case out of the statue of frauds...upon the ground of part performance, the acts of possession must be clear and definite, and referable exclusively to the contract, and by authority of the vendor. The existence of the contract and its terms should be established by competent proof to be clear, definite, and unequivocal in all its terms. If its terms, or the necessary acts of part performance, are not sustained by satisfactory proof, specific performance will not be decreed." (Citations omitted.) *Houston v. McClure,* 456 So. 2d 788 (Ala. 1984). Not only is Mr. Davis unable to prove the existence of a contract, he is unable to establish the terms of the alleged contract. Mr. Davis was not even clear as to the purchase price of the property. (See Davis Deposition

p. 14

"Q. And what did the contract say, the best you remember?

A. Just that I would be purchasing the house at the  -- I would be --  Let me get it together.

Q. Take your time.

A. It was just pertaining to me buying the house from her on a rent-to-own basis, and I would pay – I think at the time, I think the value of the

5

house was about 89 or so thousand dollars. I'm not sure of the exact figure. But I would be paying approximately 60 or – 60 or 65,000 or something for it. So that was our agreement."

p. 15

Q. "Do you recall the exact price?

A. No, I don't."

p. 17

Q. "All right. So when do you think you made the agreement?

A. About '95 or '96. It was a couple of year after I had moved in."

p. 136

Q. "How long were you going to pay her $500 a month under this agreement you and she had allegedly reached?

A. Well, you know, up until that time, I wasn't even keeping up with how much money I had paid or anything. But like I said earlier, we had agreed earlier that it would be 60, $65,000, and that would be it. But up until – but I never—because we were so close and because we had discussed it and said whatever we have when we get through is going to be ours anyway, so—." )

Thus, according to the Statute of Frauds, any agreement between Dumas and Davis for the sale, purchase of her property is void. There is no writing to evidence the sale of the property, no witnesses to the existence or

6

execution of a contract, no clear terms of the alleged sale no proof that the Plaintiff paid Defendant Dumas for the property.

## LOST DOCUMENT

Supposing for a moment that an executed contract for the sale of the property between Dumas and Davis did exist, then that contract must be produced.    A Court cannot admit evidence of a contract that does not exist or cannot be produced.

"In order to admit evidence of a lost document, the proponent must establish: (1) the existence and execution of the document; (2) the substance of its contents; and (3) the loss or destruction of the documents or other satisfactory reason for failure to produce the original." *Bradley v. Nall,* 505 So. 2d 1062, 1064 (Ala. 1987), citing *Wiggins v. Stapleton Baptist Church,* 282 Ala. 255, 210 So. 2d 814 (1968).    "The degree of proof required to establish a lost instrument depends upon the circumstances. The importance of the instrument affects the quantum of evidence required to prove the former existence and contents of a lost instrument. The greater the value the more conclusive should be the evidence.    Where the lost instrument constitutes a muniment of title to real estate, a higher degree of proof is required with respect to the former existence and contents of the instrument than with respect to other instruments." 52 Am. Jur. 2d *Lost & Destroyed Instruments* §60 (1970).

Mr. Davis fails every element of the above stated standard necessary to admit a lost document. First, he cannot prove the existence, much less the execution of any document evidencing a contract to purchase. According to Defendant Dumas, no such contract for the sale of her property ever existed. (*See Dumas Affidavit* ¶ 3.) Further, Mr. Davis cannot produce a single witness to the existence of the document nor a single person that witnessed the execution of the documents.

Second, Mr. Davis cannot establish the substance, date, or contents of the document. As has been previously established in this memorandum, Mr. Davis himself is unable to clearly define the exact nature, date or terms of the alleged document.

Third, Mr. Davis is unable to clearly establish the reason for the loss or destruction of the document. Mr. Davis alleges on the one hand that Defendant Dumas "destroyed the document once she illegally and improperly gained the control of the home and the contents of said home." (See Plaintiff's Objection to Motion for Partial Summary Judgement (sic) ¶2 filed May 3, 2004.) On the other hand, Mr. Davis asserted that he told Defendant Dumas to keep the contract for him. (Davis deposition p. 13 "...And because of me being the way I am with paperwork, she was the one who kept it. I told her to keep that for me.")

## CONCLUSION

For the foregoing reasons, and because Defendant Dumas was in possession of the deed to the house at the time that this dispute arose (Deed attached hereto and incorporated herein by reference as Exhibit "B.") then Defendant Dumas' Motion for Partial Summary Judgment must be granted and Defendant Dumas be declared the rightful owner of the property at the time this dispute arose.

Respectfully submitted this 8 of July, 2004.

**Capell & Howard, P.C.**

By: _George L. Beck_

**George L. Beck, Jr. (BEC011)**
Attorney for Defendant Dumas
P.O. Box 2069
Montgomery, AL  36102-2069
(334) 241-8000 phone
(334) 241-8291 fax

9

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document on the following counsel of record by placing a copy in the United States mail, postage prepaid and properly addressed to them on this _____ day of _____, 2004.

Attorney for Defendant Armstrong:
**Hon. C. Winston Sheehan, Jr.**
Ball, Ball, Matthew & Novak, P.A.
P.O. Box 2148
Montgomery, AL  36102-2148

Plaintiff attorney:
**Hon. Michael Rountree**
ROUNTREE & ASSOCIATES, P.C.
448 Saint Lukes Drive
Montgomery, AL  36117

**Capell & Howard P.C.**

By: _____
**GEORGE L. BECK, JR. (BEC011)**

3

1   Q.   Now, you indicated you had some receipts?

2   A.   Yes.

3   Q.   And those receipts are listed in your

4        response to the request for production

5        which you've just signed?

6   A.   Uh-huh (positive response).

7   Q.   Now, let's go back and talk about the

8        deed.  At any time have you ever received a

9        deed to the premises located on Rosedon?

10  A.   No.

11  Q.   At any time have you executed a mortgage on

12        the residence located at Rosedon?

13  A.   No.

14  Q.   At any time has Ms. Edna Dumas ever signed

15        a deed to you to the residence at Rosedon?

16  A.   We never signed a deed.  We did a contract

17        and it was signed by both of us, and she

18        was the one who had it.

19  Q.   I'm going to talk about that contract in a

20        minute.

21  A.   Okay.

22  Q.   But to your knowledge, Ms. Dumas never

23        executed or signed a deed --

13

```
 1    A.    No.

 2    Q.    Wait a minute.

 3          -- of the residence to you?

 4    A.    No.

 5    Q.    Now, you mentioned a contract.

 6    A.    Uh-huh (positive response).

 7    Q.    Tell us what you mean about the contract.

 8    A.    We had -- I had lived in the house for

 9          approximately two years or so.  And I had

10          stated to Ms. Dumas that I had been

11          spending a lot of money in business,

12          because I had a couple of businesses, and I

13          had never put any money into a home.  I was

14          living in that house on Rosedon Drive at

15          the time.

16                And she stated that, well, since I was

17          planning on buying a house, then, why not

18          buy -- you know, buy that house on a

19          rent-to-own basis?  And we made that

20          agreement.  Filled out a contract.  And

21          because of me being the way I am with

22          paperwork, she was the one who kept it.  I

23          told her to keep that for me.
```

14

1    Q.   Okay.  On this paperwork you say that was

2         filled out, did a lawyer get involved?

3    A.   No.

4    Q.   Was there any attorney contacted or --

5    A.   No.

6    Q.   -- consulted concerning the drafting or

7         drawing of this contract?

8    A.   No.  We were very close, and I trusted her.

9    Q.   And what did the contract say, the best you

10       remember?

11   A.   Just that I would be purchasing the house

12       at the -- I would be --

13          Let me get it together.

14   Q.   Take your time.

15   A.   It was just pertaining to me buying the

16       house from her on a rent-to-own basis, and

17       I would pay -- I think at the time, I think

18       the value of the house was about 89 or so

19       thousand dollars.  I'm not sure of the

20       exact figure.  But I would be paying

21       approximately 60 or -- 60 or 65,000 or

22       something for it.  So that was our

23       agreement.

Q.  You're saying even though the value was
    about 89,000, you and she agreed on a price
    somewhere between 60 and 65?

A.  Right.

Q.  Do you recall the exact price?

A.  No, I don't.

Q.  Do you recall the terms of the sale?

A.  Terms meaning?

Q.  How much -- how were you going to pay it?
    How were you going to pay for it and how
    long and this type thing?

A.  Well, the way that I paid it was I didn't
    pay -- the first couple of years when I was
    renting, I was paying -- I was paying the
    mortgage.  I would take the mortgage down
    to the mortgage company, money order, and I
    paid that.

        Then after we made that agreement, then
    I would start to pay her so much money
    cash, because she didn't want me to give
    her money orders or anything like that.

        Because of my finances at the time, I
    didn't have a whole big income coming in,

1    so every time that I got a good amount of

2    money coming in, she would either come here

3    and visit me or I'd visit her, and I would

4    give her a certain amount of money.

5  Q.  I'm going to back up.  That's not exactly

6    what I was asking.  I apologize.  I

7    probably didn't ask you right.  Let me

8    start again.

9       When did you first move into this

10   house, what year?

11 A.  I think it was the last part of '93, first

12   of '94.

13 Q.  Now, did you pay rent on that house?

14 A.  At the beginning, yes.

15 Q.  How much did you pay?

16 A.  I started off at $200, I think it was.

17 Q.  $200 a month?

18 A.  Uh-huh (positive response).

19 Q.  And how would you pay that?

20 A.  By money order.  I would take it down

21   myself and pay the -- pay the -- right up

22   here at Regions, up the street here.

23 Q.  You paid Regions Bank?

1  A.  Uh-huh (positive response).

2  Q.  Was Regions the one holding the mortgage?

3  A.  Yes.

4  Q.  And where did you buy your money order?

5  A.  From any little -- some post office,

6      wherever was available.  I would just get

7      one and take it down and pay it.

8  Q.  And do you have copies of the money orders?

9  A.  No, I don't have -- she -- everything that

10     was in the house was destroyed or she still

11     has, so she may still have one.

12 Q.  How long did you pay $200 a month rent?

13 A.  Couple of years, until we made the

14     agreement.

15 Q.  All right.  So when do you think you made

16     the agreement?

17 A.  About '95 or '96.  It was a couple of years

18     after I had moved in.

19 Q.  Did the amount of rent change?

20 A.  Yes.

21 Q.  What happened in '95 or '96, whenever you

22     made the agreement?

23 A.  It changed to $500 a month.

1      to work in '95.

2  Q.   And then shortly after that is when you say

3       you and she entered into this agreement to

4       buy the house -- buy and sell the house?

5  A.   Yes.

6  Q.   And at that time, you agreed to pay her

7       $500 a month?

8  A.   Uh-huh (positive response).

9  Q.   So you were working at Greyhound at the

10      time the agreement was reached.  Were you

11      paying her $500 a month?

12  A.  Uh-huh (positive response).

13  Q.  How did you pay her?

14  A.  By cash.

15  Q.  Each month?

16  A.  Yes.  Oh, no.  No, I didn't pay her each

17      month.  No.  We had arranged that I would

18      pay her whenever I saw her.  I would give

19      her, you know, cash.

20  Q.  Did you ever mail her any money?

21  A.  I mailed her a few money orders.  Not too

22      many, because she didn't want, you know,

23      money orders or checks.

1    three to $4,000 sometimes at one time.

2    Q.    Do you think you paid her $6,000 cash in

3          1995?

4    A.    I don't know.  That was a while back.

5    Q.    How about -- Excuse me.  I didn't mean to

6          cut you off.

7    A.    That was quite a while back, and I don't

8          remember exactly how much it was that I

9          paid her then.

10   Q.    How about 1996?

11   A.    Like I said, I don't know exactly how much

12         I paid each year, but I did give her quite

13         a bit whenever I would give it to her.  We

14         never kept records of any of it.

15   Q.    Is there any way sitting here today that

16         you can prove you paid one dime to

17         Ms. Dumas from 1995 to the present?

18   A.    Yes, sir.

19   Q.    How do you do that?

20   A.    She did not get -- when she took over the

21         house, she didn't get all of my receipts.

22         I did manage to find some of the stuff that

23         I did.

136

1    in any way.

2         And every time she tried to give me

3    something, I never took a dime from her

4    except for, you know, when I was doing

5    business stuff, and that was it.

6  Q.  How long were you going to pay her $500 a

7    month under this agreement you and she had

8    allegedly reached?

9  A.  Well, you know, up until that time, I

10    wasn't even keeping up with how much money

11    I had paid or anything.  But like I said

12    earlier, we had agreed earlier that it

13    would be 60, $65,000, and that would be

14    it.  But up until -- but I never -- because

15    we were so close and because we had

16    discussed it and said whatever we have when

17    we get through is going to be ours anyway,

18    so --

19  Q.  And so --

20  A.  I'm sorry.  Go ahead.

21  Q.  No, I didn't mean to interrupt.  I'm just

22    trying to get through.  Mr. Sheehan is

23    going to have some questions.

IN THE CIRCUIT COURT FOR
MONTGOMERY COUNTY, ALABAMA

THEODORE DAVIS, )
)
    Plaintiff, )
)
) Case No. CV-2004-370
)
ARMSTRONG RELOCATION. LLN., et al., )
)
    Defendants. )

## AFFIDAVIT OF EDNA DUMAS

Before me, the undersigned notary public in and for said state and county, personally appeared Edna Dumas, who upon being duly sworn on oath deposed and said as follows:

1.    My name is Edna Dumas and I am over the age of 19. This affidavit is based upon my own personal knowledge regarding the matters of the above styled case and is submitted for the purpose of supporting a motion for summary judgment.

2.    At no time did I ever deed the property at 207 Rosedon Drive, Montgomery, Alabama to Theodore Davis.

3.    At no time did I ever agree to sell, nor sell the property at 207 Rosedon Drive, Montgomery, Alabama to Theodore Davis.

Further, Affiant saith not.

1

**EXHIBIT**

_____A_____

STATE OF NEW JERSEY          }
                             }
COUNTY OF BERGEN             }


Dated this 23 day of April, 2004.

Affiant _Edna Dumas_
Edna Dumas


Sworn to and subscribed before me on this ___23___ day of April, 2004.

NOTARY PUBLIC
My Commission Expires: September 25, 2007

{SEAL}


HEATHER K. STROHL
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES SEPTEMBER 25, 2007

2

THE STATE OF ALABAMA.  
_____ COUNTY. }

One Hundred and No/100 _____ DOLLARS

KNOW ALL MEN BY THESE PRESENTS, that in consideration of _____ and other valuable considerations to the undersigned GRANTOR or GRANTORS in hand paid by the GRANTEE(S) herein, the receipt whereof, is hereby acknowledged we, **Louis Norman Gotthelf and Penny Gale Gotthelf, individually and as husband and wife** (herein referred to as GRANTOR(S), do hereby GRANT, BARGAIN, SELL and CONVEY unto **Edna Dumas** (herein referred to as GRANTEE(S),

**her** heirs and assigns, the following described Real Estate, situated in the County of **Montgomery** and State of Alabama, to-wit:

Lot 13, Block 12, according to the Map of Spring Valley Plat No. 10, as said Map appears of record in the Office of the Judge of Probate of Montgomery County, Alabama, in Plat Book 24, at Page 147.

This conveyance is made subject to that certain mortgage in favor of Real Estate Financing, Inc., dated January 28, 1977, filed for record in the Office of the Judge of Probate of Montgomery County, Alabama, January 31, 1977, in Real Property Book 0330, at Page 0687; Grantees by their acceptance hereof assume and agree to pay said mortgage and the note secured thereby according to their terms.

This conveyance is made subject to covenants, restrictions, reservations, easements and rights of way heretofore imposed upon the subject property.

TO HAVE AND TO HOLD, the aforegranted premises to the said GRANTEE(S), **her** heirs and assigns FOREVER.

And GRANTOR(S) do _____ covenant with the said GRANTEE(S), **her** heirs and assigns, that **they are** lawfully seized in fee simple of the aforementioned premises; that they are free from all encumbrances, except as hereinabove provided; that **they** have a good right to sell and convey the same to the said GRANTEE(S), **her** heirs and assigns, and that GRANTOR(S) will WARRANT AND DEFEND the premises to the said GRANTEE(S), **her** heirs and assigns forever, against the lawful claims and demands of all persons, except as hereinabove provided.

IN WITNESS WHEREOF **we** have hereunto set **our** hand **s** and seal **s** this **7th** day of **September** 19 **89**

WITNESS

_____ (L. S.)  
Louis Norman Gotthelf

_____ (L. S.)  
Penny Gale Gotthelf

_____ (L. S.)

_____ (L. S.)

THE STATE OF ALABAMA.  
**Montgomery** COUNTY. }

I, **the undersigned** a Notary Public in and for said State **at Large** hereby certify that **Louis Norman Gotthelf and Penny Gale Gotthelf** whose name **s are** signed to the foregoing conveyance, and who **are** known to me acknowledged before me on this day, that, being informed of the contents of the conveyance **they** executed the same voluntarily on the day the same bears date.

Given under my hand and official seal this **7th** day of **September** 19 **89**

_____ Notary Public.

This instrument was prepared by:

| FOR RECORDING ONLY | | | |
|---|---|---|---|
| STATE OF ALA. MONTGOMERY CO. I CERTIFY THIS INSTRUMENT WAS FILED ON | 01 | INDEX | 1.00 |
| | 02 | REC FE | 1.00 |
| | 02 | REC FE | 2.50 |
| Sep 12 4 01 PH '89 | 04 | DED TX | 29.50 |
| | | TOTAL | 34.00 |

7-12-89   187445

JUDGE OF PROBATE

I HEREBY CERTIFY THAT THIS IS A TRUE, CORRECT AND CONFORMED COPY OF THE EXECUTED ORIGINAL NOW IN OUR ATTORNEY

EXHIBIT  
B