4          So she said, you're going to get out of
5     here.  I have the deeds to this house.  You
6     don't have any proof at all.  And I said,
7     oh, yes, I do.  I said, I know I've been
8     living here, I said, and you're not going
9     to put me out of here like this.  I said,
10    what are you trying to do?
11         So the guys came in I guess as a
12    threat.  And so I said, well, I'm going to
13    call the police.  Well, you call the
14    police.  The police can't do anything about
15    this because I've got my proof right here.
16         So I think at that time, I think I did
17    call the police.  And so she told me I had
18    to get out.  While he was on his way, they
19    were still telling me to get out of the
20    house.  And I told them -- I said, I'm not
21    going anywhere, I said, and we'll
22    straighten this out.  I said, you guys are
23    going to get out of here.

0                                                                      61

1          So the police came, and so we told the
2     police what was going on.  And so she had
3     the deed, and she handed him the deed.  And
4     so I told him, I said, yeah, but she has
5     the other paperwork, too, I said, because
6     I'm buying this from her.  And she made --
7     he's not buying a damn thing from me.  And
8     this is my house, I have the deeds, and I
9     have the right to put him out.
10         So I said, well, even if that were so,

Page 47

06-15-2004 TDavis.txt

11    you don't have the right to put me out.  I

12    said, I don't have to go anywhere right

13    now.  I said, you would have to go through

14    a procedure to put me out of here.  I said,

15    but I don't want any trouble.  I said, I've

16    got good neighbors.  I don't even want them

17    to know what's going on.  She said she

18    didn't give a damn about that; all she

19    wanted was my ass out.

20        So the nephew was in the background,

21    telling me I had to get out, and he was

22    threatening.  So because of her and my

23    relationship, I didn't say a thing to him.

0                                                              62

1     I just let him talk.

2         And then I got phone calls from the

3     daughter.  The daughter called and said,

4     what's this?  You remember telling me

5     that -- at one time that you were buying

6     this house from my mom?  Because she had

7     given me a lot of problems before.  So I

8     just told her what was happening.  I said,

9     now, your mom and I had an agreement.  I'm

10    buying this house.

11        And so on the phone, she reminded me of

12    that.  She said, you remember telling me

13    that you were buying the house from my

14    mom?  Well, what's this stuff about?  My

15    mom has the deeds to the house, and my mom

16    said that she owns the house.  And so she

17    said, you're going to get yours, so on,

                              Page 48

156

Q.   And how long had you lived in Rosedon Drive?

A.   From 1994 -- I don't remember the month.

     1994 to January -- I mean, January 18th of

     this year.

Q.   And where did you live before that, sir?

A.   I lived on 117 National.

Q.   And what --

A.   In Montgomery.  That's --

Q.   Where about is that?

A.   That's right off of -- off of -- what's the

     main street?

Q.   You mean like downtown or --

A.   Uh-huh.  It's right over off of Cleveland

     Avenue.

Q.   All right.  And about how long did you live

     there, sir?

A.   About eight years.

Q.   About before that, where did you live, sir?

A.   In Cloverland Shopping Center -- Apartments.

     Cloverland Apartments.

Q.   And about how long there, sir?

A.   I guess about eight years.

Q.   And that's fine.  Just approximately.  And

168

1     the police report on the telephone

2     conversation I had with the lady, when I

3     asked her to send the police to meet me, she

4     said meet them at the house, and I told her,

5     I said, no, I don't want to do that.  I said

6     I'd rather wait somewhere else.  And she

7     said -- and the lady on the phone said, okay,

8     well, can you wait at a neighbor's around the

9     corner?  And I said, yes, I'll do that.  And

10    I did.  I waited up the street at a

11    neighbor's  house until the police came by,

12    and then I went.  The police parked in front

13    of the door and I parked behind it.  And then

14    they saw me, Officer S. J. Watts.

15  Q.  Now, Officer Watts --

16  A.  Officer Watts was --

17  Q.  -- was the officer who was with you --

18  A.  When I went to the house.

19  Q.  -- on the night --

20  A.  On the night that this happened.  On the

21    18th.  That -- that was the same day that I

22    was evicted.

23  Q.  All right, sir.  Again, help me if you

1    that was the trespassing incident.

2         And then I was also -- in Birmingham,

3    about three weeks later, I got a letter from

4    the Sheriff's Department there.  And she had

5    said that I had said -- told her daughter in

6    a -- in a telephone conversation that I would

7    kill her and that the neighbors had told

8    her --

9  Q.  Would kill whom?

10 A.  Ms. Dumas.

11 Q.  All right, sir.  I'm sorry.  Let me see if

12     I've got the sequence of events.  About 8:30

13     in the morning, the incident occurred that

14     you've described --

15 A.  Occurred, uh-huh.

16 Q.  -- previously?

17 A.  Yes, sir.  But, now, this policeman who came

18     that morning was not the same one.  This one

19     here is the one that came on the 18h that

20     night and on the 19th.

21 Q.  Okay.  Let me see if I can -- and I

22     apologize.  I'm, afraid, trying to gather all

23     this information; I'm getting my dates and

1        days messed up.  The first incident is at

2        about 8:30.  How long did that last, just

3        approximately?

4   A.   Oh, gosh.  It seemed like a lifetime, but I

5        assume I didn't even stay there 40 minutes,

6        because they gave me five minutes to leave.

7        But with everything happening and stuff, I

8        know it was -- I stayed there 20 minutes I

9        know trying to get what I could, because he

10       threatened me and told me he'd put me in jail

11       if I didn't hurry and get out.

12   Q.   And you said that officer was not Mr. Watts?

13   A.   Not the same, no, sir.

14   Q.   Can you describe -- was it one or more

15       officers?

16   A.   Just one officer.

17   Q.   And how would you describe that officer?

18   A.   He was a black officer.  I didn't pay him any

19       real attention.  I couldn't remember much of

20       anything that morning.  I was really just

21       trying to figure out what I was going to do

22       next, you know, because of him putting the

23       pressure on me telling me that I had to

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION. LLN.. ET AL.

June 17, 2004

Page 174

1  Q. Ms. Dumas?
2  A. Ms. Dumas and two other -- from what I saw,
3     there was only two other guys with them. So
4     there was a total of four that I saw.
5  Q. And they appeared to be friends of the nephew
6     or Ms. Dumas?
7  A. I don't know who they were friends of. I
8     didn't know them. But, you know, they all
9     came in and was yelling. Well, the
10    two that I -- that came in, I -- they didn't
11    say anything. It was just she and her
12    nephew. And they were the ones who were
13    yelling get out, get out, you got to get out,
14    it's time for you to go.
15 Q. All right. Now, when did Mr. Hardy arrive?
16 A. I guess it may have taken him six or seven
17    minutes or so. He got there really
18    quick there. It wasn't long at all.
19 Q. And his first name is?
20 A. Thomas.
21 Q. Okay. Does he live in the same area?
22 A. No. He -- he -- he lives in the Twin Gates
23    area. But I -- when I called him -- I don't

Page 175

1     remember whether he was on a cell phone or
2     where I called him, but he got there
3     fairly -- pretty fast.
4  Q. If you would help me, where is Rosdon? Is it
5     Rosdon or Rosedon?
6  A. Rosedon. It's right off Woodley Road. You
7     go down Woodley Road to Peter Crump School,
8     and it's right there -- that subdivision
9     right there right at that light a block from
10    Peter Crump. It's the -- Spring Valley.
11 Q. Okay. That would be the neighborhood. I
12    gotcha.
13 A. Uh-huh.
14 Q. After Mr. Hardy arrived, about how long were
15    you there?
16 A. Maybe ten or 15 minutes.
17 Q. Fair enough. Now, was the police officer --
18    just one police officer there the entire
19    time?
20 A. Yes, sir.
21 Q. Did any charges arise out of that 20 to 40
22    minute confrontation with Ms. Dumas?
23 A. No, sir.

Page 176

1  Q. And when you left the house on Rosedon, where
2     did you go?
3  A. To Mr. Hardy's house.
4  Q. And about how long did you stay there, sir?
5  A. I stayed there about three or four hours, I
6     guess, until I decided that there were -- I
7     needed to go back and get the money out of
8     the safe and my medicine that I had left.
9  Q. And that's when you called the police to
10    assist you in going and making the entry?
11 A. Yes, sir.
12 Q. And then that's when you first saw --
13 A. Mr. Watts.
14 Q. Mr. Watts. And, I'm sorry. Is 5:18 p.m., is
15    that the time you arrived or when you called
16    him when you first saw him?
17 A. I'm not sure. It might have been the
18    time -- I'm -- I think it probably -- he put
19    it down at the time that I called. I'm not
20    sure.
21 Q. All right. Is that Lieutenant Signore?
22 A. Yes, sir. He's the one I saw yesterday who
23    told me if I needed any other information,

Page 177

1     that I could call this number and maybe he
2     could help me.
3  Q. Okay. Is he some sort of supervisor --
4  A. Yes, sir.
5  Q. -- for that division? And how would you make
6     contact with Lieutenant Signore?
7  A. I went down and requested the information on
8     the incident for that -- for my arrest. And
9     they didn't have anything on the morning of
10    that. The only thing they had was the arrest
11    thing. That's all that they found. They
12    didn't have anything on the -- I guess on the
13    call that morning or anything. This was all
14    that I was able to get was the -- the arrest
15    portion of that.
16 Q. Did they give you a report on the arrest?
17    MR. ROUNTREE: Yes. George has got
18       it. He took it to make a copy.
19       He's going to bring it back.
20    MR. SHEEHAN: Thank you.
21 Q. I guess that report is going to say about how
22    long --
23 A. It doesn't -- from what I could see, it

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261: fax 263-1243

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

June 1?

Page 178

1    didn't have how long I stayed in there.
2        MR. ROUNTREE: It's a very poor report.
3    Q. Prepared by Mr. Watts, I guess?
4    A. Maybe. I'm not sure, because -- no, sir, it
5        was not. It was -- because what happened was
6        I -- we never could find out who it was who
7        made the actual report and put -- had me put
8        in jail. We never found out who that was. I
9        don't know who it was. Because when I went
10       to try to get some help from the police
11       on -- on the 20th, I think it was -- let's
12       see. 18th, 19th. On the 20th, I went down
13       to a couple of lawyers and asked questions
14       about what I could do to get my belongings
15       out of the house. They said it was a civil
16       matter and it would be a lot of work. And so
17       they suggested that I go to the County. I
18       went to the County and I asked them. They
19       said they couldn't do anything because it was
20       a civil matter. I went to the police
21       department --
22   Q. Now, when you say you went to the County,
23       would that be the Sheriff's Department?

Page 179

1    A. Yes, sir, uh-huh.
2    Q. I'm sorry.
3    A. I went to the police department then on
4        Ripley and I requested their help. And the
5        young lady stated that she could not do
6        anything for me, but that she had some sad
7        news for me; that I would be retained
8        there was a warrant for my arrest for
9        criminal trespass.
10   Q. Is that first time that you learned that she
11       had sworn out a warrant for you?
12   A. Yes. Well, they had mentioned it the
13       night -- you know, when the police and I went
14       in that night before, they had mentioned it,
15       because he had told her that she had the
16       right to do it. But I didn't know whether
17       she would or not because she kept yelling,
18       I'll put you in jail, I will put you in jail;
19       but I didn't know that she, you know, would
20       go through with it.
21   Q. About how long did the incident with Officer
22       Watts -- how long did that take?
23   A. After we initially went into the back door

Page 180

1    and I stepped out, I guess it was a matter of
2    15 minutes. Because after he heard whatever
3    it was she told him, he kept telling me be
4    quiet, be quiet, don't say anything, listen
5    to me. And then he told me you've got to go,
6    she's only going to give you your medicine.
7    And I told him, I said, well, sir, I got
8    other things in there I need to get. I said,
9    I need -- I said, walk with me -- walk
10   through here with me, let me get what I need
11   to get and then I'll leave. Sir, you're not
12   going in there. She doesn't want you in
13   there, you're not -- I said, I live here.
14   These are my things. I said they're sitting
15   on -- eating my food and sitting on my
16   furniture, and I -- and these are strangers
17   going through everything I have. They went
18   through it piece by piece and threw away or
19   kept whatever they wanted to keep. These are
20   things that were mine. I'm an adult.
21   Whatever I had in there was mine. And they
22   went into the safe. The pictures that were
23   shown yesterday, now, some of those I didn't

Page 181

1    know anything about. I had -- you know,
2    because I have other roommates who had lived
3    with me through the years. But the ones that
4    I did recognize were in my safe. And so I
5    know she had to have gone into my safe to get
6    those.
7    Q. When you went in with Officer Watts that
8        Sunday evening, did you see the safe?
9    A. I wasn't able to go in.
10   Q. Okay.
11   A. I was in the kitchen at the back door, and I
12       wasn't allowed to go in.
13   Q. Were the nephew and his two friends still
14       there Sunday evening?
15   A. The nephew -- I didn't see anybody but she
16       and the nephew. They were the ones who came
17       rushing in cursing the police and me out.
18       And so they were -- they were the only ones
19       that were there.
20   Q. That Sunday evening?
21   A. That Sunday evening.
22   Q. All right, sir. You stayed there about 15
23       minutes give or take?

10 (Pages 178 to 181)

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 3
ph: (334) 263-0261; fax 263-

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

June 17, 2004

Page 182

1    A. Yes, sir.
2    Q. And then where did you go, sir?
3    A. I went back around the corner to a friend of
4       mine, Ms. Vaughn's house. She lived
5       around -- she lived on 207 Riding Avenue.
6       And I went around to her house to wait for
7       the police to pass by so I could tell him my
8       money was in there so he could take me back
9       to get it, but he never showed up.
10   Q. Is that where he had met you?
11   A. That's -- he was the one who was called, and
12      that's where he met me, at the house,
13      uh-huh. And so I waited for him to come back
14      by so I could stop him, but he never did show
15      up. So I asked her if she would take me
16      around that way. So she took me around. And
17      when she took me around, he was standing
18      there watching the movies with Ms. Dumas and
19      all. That's why --
20   Q. The police officer?
21   A. The police officer. That's why he was there
22      and had not left. She had shown him quite a
23      few of the movies and stuff, and he was

Page 183

1       watching them with her.
2    Q. At night?
3    A. And then we went -- yes, sir, that night.
4       After I -- after they made me leave. And so
5       we went up the street, came back by to make
6       sure that that's what we was. And so -- so
7       we slowly went on by, and then I left and
8       went on to Birmingham after he had told me if
9       I come back, they would arrest me.
10   Q. I'm sorry. Ms. Vaughn's name is?
11   A. Jennifer Vaughn, uh-huh.
12   Q. Now, is she -- was she a neighbor?
13   A. She was a neighbor, uh-huh. Yes, sir.
14   Q. All right. When you left the house, did you
15      have transportation or did you have to borrow
16      someone's car?
17   A. No. I had -- I had my car. Now, I had left
18      one in the yard. I had two cars. I
19      had -- one was left in the yard that she had
20      pulled in. She had that one --
21   Q. What make and model was that, sir?
22   A. It was a '93 Mercury Grand Marquis.
23   Q. And the one you were driving was a --

Page 184

1    A. '84 Lincoln Mark VII.
2    Q. So when you drove by, you were in the '84
3       Lincoln --
4    A. No, sir. I was in Ms. Vaughn's car.
5    Q. Okay. And after driving by, about what time
6       was that, sir?
7    A. Gosh. This was about five something. So I
8       guess it had to be somewhere around six or
9       something. I'm not sure. It -- it was dark,
10      though. It had gotten dark.
11   Q. And where did you go then, sir?
12   A. I left her house and went to my sister's in
13      Birmingham.
14   Q. So that evening, you drove to Birmingham?
15   A. Yes, sir.
16   Q. And I'm sorry. You probably gave us the name
17      of your sister, but your sister --
18   A. Mary Drake.
19   Q. And she lives at --
20   A. 5608 Terrace J, as in John.
21   Q. The letter --
22   A. Just the letter J, uh-huh. And that's
23      Birmingham, Alabama.

Page 185

1    Q. Okay. And her telephone?
2    A. 35208 is the zip.
3    Q. And her telephone number is?
4    A. 205-924 -- I'm -- I'm sorry. 923-4432.
5    Q. 4432?
6    A. Yes.
7    Q. How long did you stay there at 5608 Terrace?
8    A. From that day until today. I'm still there.
9    Q. Oh, I'm sorry. You spent the night there?
10   A. Yes, sir.
11   Q. Did you come back to Montgomery the following
12      day?
13   A. Came back -- no. The following day was when
14      the incident happened. I couldn't come back
15      because they told me they'd put me in jail if
16      I came back. So I wasn't -- I didn't come
17      back.
18   Q. Was it Officer Watts who told you he was
19      going to put you in jail?
20   A. Both officers. The one that morning of the
21      18th that came out told me if I came back,
22      that they would have to arrest me.
23      And -- and then -- but he did say that if I

11 (Pages 182 to 185)

Dunn, King & Associates
Toll free (800) 359-9001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

June 17, 2004

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 186

1    needed to come back, call an officer and they
2    would probably send somebody to come back
3    with me if I needed to come back. But I had
4    to leave or he would put me in jail that
5    morning. Okay. And then I called Officer
6    Watts, and he -- after her -- hearing
7    Ms. Dumas and she had the deeds and all of
8    this, to the house, and then he told me that
9    I had no rights and that I had to leave and
10   that if I came back, that I would be
11   arrested.
12  Q. Can you describe Officer Watts for me?
13  A. He was a black officer also. I guess he
14   might have been about six-two, three -- I'm
15   not sure, really -- and about 200 or so
16   pounds.
17  Q. Did he say he had had any communication with
18   the officer from the morning?
19  A. No, sir.
20  Q. Do you think he had any knowledge of what had
21   taken place that morning?
22  A. I doubt it. I doubt it. I don't think they
23   did. Because that was early morning and this

Page 187

1    was that afternoon.
2   Q. So probably a different shift?
3   A. Yes, sir, uh-huh.
4   Q. So Monday morning, about what time did you
5    get up at your sister's?
6   A. It was early, because I couldn't really
7    sleep. I didn't really get any sleep that
8    night. So I remembered getting a call from
9    my daughter's sister. Yes, it was my
10   daughter's sister. We -- I don't
11   have -- she's not my child. Okay.
12  Q. And her name is?
13  A. Linda Grant.
14  Q. And where does she live, sir?
15  A. She lives here in Montgomery.
16  Q. At --
17  A. And I don't know her address, but it's in
18   Spring Valley in the same area around the
19   corner from where I was living. But she's on
20   Spring Valley Drive.
21  Q. All right. And your daughter's name is?
22  A. Aliya Bryant.
23  Q. And where does she live, sir?

Page 188

1   A. She lives in Birmingham.
2   Q. And the address there is?
3   A. I don't know her's either right offhand. But
4    I received the call from Linda. And she had
5    stated that I needed to get down here because
6    my things were being put out on the street.
7    And so I told her I couldn't come because
8    what he had told me, I would be arrested.
9    And I said, well, is there anything that you
10   can do? So she can -- so I guess there
11   wasn't anything she could do.
12       But I didn't know that they had talked
13   to my daughter, too. And my daughter had
14   gotten some people and they were on their way
15   down here to try and retrieve whatever they
16   could, whatever help they could give.
17   Because after she heard it, that's what she
18   did, she just came on.
19  Q. Okay. Now, I'm sorry. Ms. Bryant from
20   Birmingham --
21  A. My daughter, uh-huh.
22  Q. -- came down?
23  A. Came down.

Page 189

1   Q. All right, sir. Did you ride with her?
2   A. I did not. I never came -- I never left -- I
3    haven't been in that area since it happened.
4    I -- she -- I stayed in Birmingham.
5   Q. All right. Did Ms. Grant go by?
6   A. She helped Ms. -- she helped my daughter to
7    get whatever they could get.
8   Q. Okay. So Ms. Grant and Ms. Bryant went to
9    the house on Monday?
10  A. Yes, sir.
11  Q. Okay. About what time did they arrive?
12  A. I don't know. I -- I couldn't tell you,
13   because I really didn't even know my daughter
14   had come until later on when I found out she
15   had come and tried to retrieve whatever she
16   could for me.
17  Q. Okay. And what did they -- what were they
18   able to get?
19  A. They were able to get my bedroom suite -- the
20   master bedroom suite. They got most of it.
21   It was damaged quite badly, but they did
22   get -- get it on the truck, because it was
23   just them and a couple of people helping

12 (Pages 186 to 189)

DEPOSITION OF THEODORE DAVIS                                                                    June 17, 2004
DAVIS v. ARMSTRONG RELOCATION, LLN.. ET AL.

Page 190

1    them. And they got a couple of pieces of my
2    grandmother's antique dinette. And I guess I
3    got a pair of shoes or something like that,
4    and that's about it. They got little shirts
5    and stuff like that that they could get. But
6    I didn't get anything any more than that.
7    Q. Okay. When did they get that stuff?
8    A. That day. That was that Monday.
9    Q. Okay. About what time?
10   A. I don't know. I don't even know what time
11   they got there or were there. Because, like
12   I said, I didn't even hear about her being
13   there until later on that day.
14   Q. About what time did you hear that she was
15   there, Ms. Bryant?
16   A. That evening. I guess it was afternoon about
17   three or four o'clock, I guess, something
18   like that.
19   Q. And when she called -- did she call you?
20   A. I don't remember. I don't remember how I
21   found out she was there.
22   Q. Okay. But about three or four o'clock, you
23   had some word from Ms. Bryant?

Page 191

1    A. Had some word that -- uh-huh, that she had
2    tried to get some things, uh-huh.
3    Q. And what did she say?
4    A. I don't even remember who it was that told
5    me. I'm at a loss for that. Really, at that
6    point, I don't know who told me, but I
7    remember their saying that my daughter was
8    there, she had tried to get certain things.
9    And I don't remember if she's the one called
10   me or who called me. You know, because I was
11   really trying to visualize everything in the
12   house sitting on the street and people coming
13   and stuff. So --
14   Q. Sure. What was your daughter's cell phone
15   number?
16   A. I don't have it.
17   Q. Okay.
18   A. But I can get all of that for you.
19   Q. Okay. And, I mean, that might help us with
20   the timing, anyway.
21   A. Okay.
22   Q. What about Linda Grant's telephone number?
23   A. I don't know that either. I think she's in

Page 192

1    the book, I think.
2    Q. Okay. Did she have a cell phone as well?
3    A. I don't know.
4    Q. Could you get that information to your
5    lawyer?
6    A. Okay.
7    Q. Thank you, sir. And, again, what that will
8    do is help us with the chronology of events.
9    A. Okay.
10   Q. So when did you next hear from anyone, say,
11   after the call from Linda Grant advising you
12   that they were moving your stuff out?
13   A. I don't remember hearing from anyone after
14   that. But I remember making a call myself.
15   I made a call to a few people. But I know I
16   got in touch with one lady who had went to
17   therapy with me who I had met in therapy.
18   And I called her because I couldn't -- I
19   don't remember who else I tried to call, but
20   I couldn't get anybody. But, anyway, I
21   called her and asked where she was in the
22   area, and she told me. I said, well, will
23   you please do me a favor. And I tried to

Page 193

1    tell her what was going on. I asked her,
2    will you please go by there -- because I
3    didn't know if anybody then -- and I didn't
4    know my daughter had went or anything -- and
5    I said, and see -- maybe see what's going on
6    for me. And so she said, okay. And
7    she -- her name is Crum. Marie Crum. And
8    she said that she would go by and see what
9    she could see. And she got there and she
10   called me and she said, Ted -- she said,
11   Lord, she said she felt sorry for me. She
12   said this is ridiculous. She said all of
13   your stuff is out in the yard and she said
14   there were people all over the place. And so
15   she said that -- so I said, well, can you try
16   to stop them while I call the police. And
17   she said, well, a policeman is already here.
18   And so I said, well, can I speak to the
19   officer. So she said, okay, and she called
20   him. She called him and she said, sir, can
21   you come here for a minute. He came over,
22   she gave him the phone. And I told him, I
23   said, well, sir, I said, I'm -- my name is

13 (Pages 190 to 193)

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN.. ET AL.

June 17, 200·

Page 194

1    Ted Davis. I said, that's my stuff. I said,
2    can you please stop them from getting it.
3    And he laughed and said, sir, I don't see
4    anybody getting anything. Everything is
5    okay, you know. And -- and so I said, okay.
6    And he gave the phone back to him, Ms. Crum.
7    And she told me, she said, Ted, he's lying.
8    She said, there's trucks in your driveway,
9    people are putting stuff on the trucks. She
10   said, there's a lady that just grabbed a
11   bottle of liquor or something -- a lady or
12   child or something -- and just ran across the
13   street with a bottle of liquor. And people
14   are going through the bags and putting bags
15   on the truck now. And then that's when I
16   told her to go up and take -- asked if she
17   saw my neighbor Mr. Johnson. And she said
18   yeah. And I said, will you go and see if
19   he's there and if he is, let me talk to him.
20   And I went -- and she took it up there and
21   asked him if he was Mr. Johnson and he said
22   yes. I talked to him and I -- and he said,
23   well, Ted, I tried. He said, but every time

Page 195

1    anybody tries to do something like that, says
2    she yells and tells them that it doesn't
3    belong to anybody and -- and they can get
4    what they want. And so that's what she had
5    told my daughter, also, that -- you know,
6    that it didn't belong to them and the people
7    could get it.
8    Q. And that would be Ms. Bryant?
9    A. My daughter. She had -- no, Ms. Bryant is my
10   daughter. Ms. Dumas told my daughter and her
11   sister -- she told the people that nothing
12   belonged to them. See, because my daughter
13   was telling them this is my father's stuff.
14   And she came out and told them, no, don't
15   listen to them. This -- nothing belongs to
16   them, get what you want.
17   Q. Telling the neighbors that?
18   A. Telling the neighbors and anybody who was
19   stopping. Because the neighbors had called
20   other people or their family. And from what
21   I understand, they had called other people in
22   to get things.
23   Q. So it was kind of take-as-catch-can, I guess?

Page 196

1    A. Get whatever you want.
2    Q. Now, Mr. Johnson is Mr. --
3    A. Don Johnson.
4    Q. And he was a neighbor --
5    A. He was two doors up from me. There was a
6    house between his and mine.
7    Q. Now, did you talk to him?
8    A. I've talked to him several times since then.
9    You mean that day?
10   Q. Yes, sir.
11   A. Yes. I talked to him because he's the one
12   who told me he had went down to try to see
13   what he could do but said that she was
14   telling everybody to get it and there was
15   nothing anybody could -- you know, nobody
16   could stop them after she told them that.
17   Q. All right. Now, is Marie Crum, was she also
18   a neighbor?
19   A. She was -- she had went to therapy with me.
20   I had -- you know, when I was injured, we
21   both had therapy together. And we kept in
22   contact to see what kind of progress we were
23   making with our injuries. And so after I

Page 197

1    couldn't get anybody else -- I didn't hear
2    anything from anybody else, I called her and
3    asked her if she could go by.
4    Q. And where does she live, sir?
5    A. I don't know. I have her phone number
6    somewhere, too. I can get that for you.
7    Q. All right. And, I'm sorry. Your cell phone
8    number is?
9    A. I don't use it enough. It's my sister's cell
10   phone. But I can get you all these cell
11   phone numbers.
12   Q. Again, that's going to help us as far as the
13   chronology of events.
14   A. Okay.
15   Q. Now, when you spoke to Ms. Crum, she's the
16   one who went and got Mr. Don Johnson?
17   A. Yes, sir.
18   Q. Okay. And then you spoke to Mr. Don Johnson?
19   A. Spoke to Mr. Johnson.
20   Q. And about what time? Again, I guess the cell
21   phone records are going to help us as far as
22   timing, but, day, night?
23   A. I don't -- it was -- it was -- it was during

14 (Pages 194 to 197)

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 361·
ph: (334) 263-0261; fax 263-12·

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 198

1    that day.
2    Q. All right, sir.
3    A. It was during that day, because --
4         MR. ROUNTREE: Is that it?
5         THE WITNESS: That's mine.
6    A. Okay. My phone -- my cell phone number is
7       205-790-3457.
8    Q. And that's with what service?
9    A. Verizon.
10   Q. And how long have you had that number, sir?
11   A. This is my sister's phone. It's not mine.
12      She just wanted me to travel with it since
13      this incident. I've only taken it whenever I
14      needed it because she wanted to keep up with
15      me.
16   Q. Now, would that be the phone that you were
17      using?
18   A. Either that or the house phone. I don't know
19      which one it was.
20   Q. And I'm sorry. The house phone number is?
21   A. 205-923-4432.
22   Q. And that's with what service?
23   A. I guess it's Bell. I'm not sure.

Page 199

1    Q. It's a home landline?
2    A. Yes.
3    Q. But these are both your sister's numbers?
4    A. Yes, sir.
5    Q. And they would be listed under?
6    A. Mary Drake.
7    Q. Mary Drake. And how many kids does your
8       sister have?
9    A. She has one, one son.
10   Q. And he lives where?
11   A. He lives with her.
12   Q. And he's how old?
13   A. He's 30 -- about 33. He works for Social
14      Security. He's a computer operator.
15        MR. ROUNTREE: One second.
16        (Off-the-record discussion)
17   Q. Ms. Crum, while present there on that Monday
18      afternoon, while speaking to you, handed the
19      phone to a police officer?
20   A. To a police officer.
21   Q. Did the police officer identify himself?
22   A. Not that I remember. All I did was when
23      I --I knew it was him because I asked

Page 200

1    if -- if I could speak to the police officer
2    and she called him over. And I assume that I
3    just knew it had to be, you know, him. But I
4    don't know if he identified himself or not.
5    Q. Do we believe that's the same officer,
6       Officer Watts?
7    A. Yes, sir. Because I think that Ms. Crum
8       had -- I -- I think she had mentioned that
9       she thought that that was his name. And so
10      when I got that yesterday, it kind of
11      verified that she did have the right one.
12   Q. So Officer Watts had been there the night
13      before?
14   A. The night before.
15   Q. And then the following day was there?
16   A. Yes.
17   Q. Would he have been in uniform?
18   A. Yes, sir.
19   Q. I wonder if it was the second shift. Then it
20      would be the afternoon shift that he was
21      there.
22        MR. ROUNTREE: The shift changes about
23           2:30, three o'clock.

Page 201

1    A. Well, my -- I had called him the night
2       before, which was on the 18th. But my
3       daughter called him on the 19th because they
4       didn't want any confrontation. And they
5       were cursing them out about getting -- trying
6       to get something. And so they didn't want
7       any confrontation. So, from what I
8       understand, they called the police department
9       and asked them to send an officer out, and he
10      was the one that they sent back. So he had
11      some long hours, I guess.
12        MR. ROUNTREE: Let's go off the record
13           a second.
14           (Brief recess)
15   Q. Sir, I understand Ms. Crum handed the phone
16      to a police officer whom we understand was
17      Officer Watts, the same officer.
18   A. Yes, sir.
19   Q. Did the voice sound the same?
20   A. Yes, sir.
21   Q. Did he identify himself?
22   A. No, sir.
23   Q. Okay. But from the voice, it appeared to be

15 (Pages 198 to 201)

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

June 17. 200

Page 202

1   the same officer --
2   A. Yes, sir.
3   Q. -- who had been there the day -- the night
4       before?
5   A. Who I talked to on the 18th, yes, sir. But
6       at the time when I first initially talked to
7       him, I did not relate him to that. I thought
8       it was familiar, but I didn't relate it to
9       him until later. And then I thought about
10      it, yes, after everything had went down, I
11      said that was the same voice, you know. But
12      initially I did not relate them.
13  Q. All right, sir. So this is January the 19th,
14      Monday, that you're talking with Ms. Crum and
15      this police officer?
16  A. Yes, sir.
17  Q. All right. And do you -- was it the
18      afternoon or the morning; do you recall?
19  A. It was -- I guess it was mid-morning, because
20      that's when I initially found out. And I
21      think it was mid-morning.
22  Q. All right. And then -- mid-morning, ten,
23      10:30 or so?

Page 203

1   A. Yes, sir.
2   Q. On Monday the 19th?
3   A. Uh-huh.
4   Q. All right. And then what's the next thing
5       that happens?
6   A. That's when she took the phone up to
7       Mr. Johnson. And -- and he talked to me and
8       told me that there was nothing that he could
9       do because of her telling everybody that they
10      could -- it was a free-for-all. And then,
11      while I was talking to him, I heard Ms. Crum
12      in the background, and she stated, oh, I wish
13      I had a camera. She said, she's walking out
14      with the police officer and he has a bag in
15      his hand. And he put -- he put a bag in the
16      trunk of his car.
17  Q. Of --
18  A. Of the patrol car.
19  Q. And then what happened, sir?
20  A. And then she gave the phone -- Mr. Johnson
21      gave the phone back to her and I told her
22      thank you for what she had done and that I
23      would be getting in touch with her again and

Page 204

1   speaking with her, and she hung up and that
2   was it. That's the last I talked to her
3   until I got in touch with her to write this
4   letter for me.
5   Q. All right, sir. Now, that's the morning of
6       Monday the 19th. What happens next
7       that -- that afternoon or noon or --
8   A. I didn't do anything else. After that I -- I
9       just -- just didn't know what else to do. So
10      that whole day went, and I just waited for
11      the next day to is when I came down, because
12      I was thinking what's my next step, which was
13      to come down here and try to get my safe, to
14      get in the house. So I was going -- I went
15      to lawyers to see if there was any paperwork
16      I could get to get into the house. They told
17      me that I had -- it was civil, that they couldn't
18      do anything and that I had to go to the
19      police. So I went to the County to the
20      Sheriff's Department. Then I went to the
21      City. And that's when I was arrested.
22  Q. All right, sir. Let me see. And, again, I'm
23      sorry, but if I keep things in chronological

Page 205

1   order, my feeble brain can keep things
2   together. Monday, did you have any other
3   telephone calls, Monday, the 20th -- January
4   20th or contacts with anyone?
5       MR. ROUNTREE: Monday would have been
6       the 19th.
7   A. It would have been the 19th.
8   Q. I'm sorry. I probably misspoke. You're
9       right. The 19th.
10  A. No, sir, not that I remember. I -- I
11      don't -- probably did have some, but after
12      I heard about what was going on, I -- I
13      really can't remember what went on that day.
14  Q. All right, sir. So we've now discussed
15      everything that you recall on Monday the 20th
16      of January?
17  A. Well, I went to the police department and I
18      was in jail on the 20th. Yes, that's when I
19      was arrested.
20      MR. ROUNTREE: Monday was the 19th.
21      MR. SHEEHAN: I'm sorry. I apologize.
22      I wrote down the 19th. I wrote
23      down the wrong date.

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery. AL 3610-
ph: (334) 263-0261; fax 263-124

June 17, 2004

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 206

1   Q. So that I'm clear, then, we can now -- we've
2      discussed everything that occurred on Monday,
3      January the 19th.
4   A. Yes, sir.
5   Q. Now, Tuesday, January the 20th.
6   A. Is when I came down.
7   Q. And about what time did you come, sir?
8   A. I don't know. I was out here as early as I
9      could be, because I wanted to get things
10     done. So it was early morning. I don't
11     remember, because I went -- started at
12     lawyers' offices and then I went to the
13     sheriff's office and then I was arrested at
14     the City.
15  Q. Who did you go see first?
16  A. I think I went to Julian McPhillips.
17  Q. Okay.
18  A. And I don't know who else I -- I don't
19     remember who else I went to, but I know I
20     went to them. And then I went to -- oh,
21     gosh. I don't remember who else it was. But
22     then I went -- but they told me to go down to
23     the County. They suggested I go down there

Page 207

1      and fill out some -- it was some form that
2      they said I could probably fill out to hold
3      the sale of the house, to keep them from
4      being able to sell the house. They said I
5      needed to fill that out first. And I went
6      looking and asking questions about how I
7      could get this form. Nobody could tell me
8      anything about that. Then they said I'd have
9      to -- if I got it, I'd have to have a judge
10     sign it to okay the hold on it. And so I
11     didn't get anywhere with that. And so I then
12     went to, like I said, the City after leaving
13     the County. And -- and --
14  Q. Now, did you actually go to the Sheriff's
15     Office in the --
16  A. Yes, sir.
17  Q. -- courthouse?
18  A. Uh-huh. Uh-huh. I talked to someone there,
19     and they told me that it was a civil -- it
20     was a civil matter.
21  Q. Do you recall who you spoke with?
22  A. No, I don't.
23  Q. And after leaving the County Sheriff's

Page 208

1      Department, where did you go, sir?
2   A. To the City.
3   Q. And who did you speak with there?
4   A. A Major Murphy. Oh, that was -- I'm sorry.
5      Let's see. That was -- yeah, that's when I
6      got arrested -- no, I'm sorry. I'm sorry.
7      I'm messing up, too. Major Murphy was after
8      all of this -- after this had happened. I
9      spoke to a young lady that was up there that
10     sits at the desk when you walk into the
11     locked door that they press. Okay. I went
12     in there to ask if I -- if she could give me
13     some idea of what I could do to talk to
14     somebody to take me over to the house. And
15     she informed me that they didn't do that.
16     She said we don't do that, sir. That's a
17     civil matter. But I can tell you this, which
18     I'm sorry to say, we are going to have to
19     detain you. And -- because there is a
20     warrant for your arrest.
21  Q. And about what time is that, sir?
22  A. That was that afternoon, I think. Well, no.
23     I spent about eight hours in there so it had

Page 209

1      to be that morning, because I stayed there
2      all day.
3      MR. ROUNTREE: 2:30.
4      THE WITNESS: I think it was 12
5          something, wasn't it?
6      MR. ROUNTREE: Yeah, 12:30. I'm sorry.
7      THE WITNESS: Yeah. Okay. Yeah.
8   Q. All right, sir. Let me show you what has now
9      been marked Defendant's Exhibit #77 and ask
10     you what that is, sir.
11  A. That's the arrest report. When I went down
12     to City Hall, they informed me that I was
13     going to be detained, and it was because of a
14     warrant that had been filed charging me with
15     criminal trespass.
16  Q. All right, sir. And about what time was
17     that?
18  A. About 12:30 p.m. on the 20th of January.
19  Q. All right, sir. So what happened then when
20     they said they were going to have to detain
21     you?
22  A. They -- I -- I had my cell phone with me, so
23     I called Mr. Hardy again, Tom Mr. Hardy again

17 (Pages 206 to 209)

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261: fax 263-1243

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

June 17, 20(

Page 210

1    and informed him that they were going to put
2    me in jail.
3    Q. And that cell phone number is?
4    A. His -- his number. His number was 2 -- his
5    number was 288-6 -- 8607. 288-8607.
6    Q. Is that 334?
7    A. Yes, sir. And he -- that's his number. And
8    that's where I called for him to come and get
9    me. And that cell phone number that you have
10   there is the number I called from, this one
11   here.
12   Q. Would be area code 205?
13   A. Yes, sir.
14   Q. 790-3457?
15   A. Uh-huh.
16   Q. Which is the account at Verizon?
17   A. Mary Drake, uh-huh.
18   Q. And about what time did he arrive?
19   A. I'm assuming it took -- at least five or six
20   hours I was there.
21   Q. Did they -- where did they -- where were you?
22   A. 1 was in a holding cell. They took
23   fingerprints and pictures and all of this

Page 211

1    stuff, I'll tell you. And it was
2    embarrassing.
3    Q. While you were there, did you see anyone that
4    you knew?
5    A. No, sir.
6    Q. Has anyone told you that they saw you there?
7    A. No, sir.
8    Q. And Mr. Hardy arrives and what happens then?
9    A. He paid the $500 bail and then we had to wait
10   for a while until the paperwork, because he
11   said he had sat down there waiting for that
12   for a couple of hours waiting for them to go
13   through that procedure. And after that was
14   cleared, then they told me I -- they came and
15   got me and gave me my clothes and all of my
16   belongings and told me that I could go. And
17   so I left with him.
18   Q. And about what time was that?
19   A. It was late that afternoon. I don't remember
20   the time.
21   Q. Had it already gotten dark?
22   A. I don't remember whether it had or not.
23   Q. All right. Where did you go, sir?

Page 212

1    A. I went back to his house. Went back over to
2    his house. I got my car and followed -- and
3    followed him.
4    Q. All right. And how long were you there at
5    Mr. Hardy's house?
6    A. I think I spent the night that night, if I'm
7    not mistaken.
8    Q. And then what -- what did you do the next
9    day?
10   A. I went to try to get him the money to pay him
11   back, because he had -- the $500, and I went
12   and got some money to pay him back.
13   Q. All right. Now, is this -- does that bring
14   us up to Wednesday, January 21st?
15   A. Yes, sir.
16   Q. Okay. So where did you go to try do get the
17   money to pay Mr. Hardy back?
18   A. I went to the credit union, to the bank.
19   Q. And which credit union?
20   A. Maxwell.
21   Q. And were you successful?
22   A. Yes, sir. I had it. It was in my account.
23   So I had it.

Page 213

1    Q. And that's where you do your banking?
2    A. Yes, sir.
3    Q. And the account name is?
4    A. In Theodore Davis.
5    Q. Were you using that address of Rosedon Drive?
6    A. Yes, sir.
7    Q. Did he ask for a cashier's cash or did you
8    get him a cashier's check?
9    A. Who is that, now?
10   Q. Mr. Hardy.
11   A. Oh, no. No. I just gave him -- gave him the
12   cash.
13   Q. All right. And then what happened, sir?
14   A. I -- I guess it was just a regular day of me
15   trying to figure out what was going on. I
16   don't know what -- I don't know what else I
17   did after that.
18       MR. ROUNTREE: Did you go to the city
19   dump?
20       THE WITNESS: I don't think that was
21   that day. I don't remember when I
22   went to the city dump. I went to
23   the city dump the day that --

18 (Pages 210 to 213)

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 3610-
ph: (334) 263-0261; fax 263-124(