Page 1

1

2    IN THE CIRCUIT COURT

3    OF MONTGOMERY COUNTY ALABAMA

4    ------------------------------------x

5    THEODORE DAVIS,

6                               Plaintiff,

7          -against-

8    GREYHOUND LINES, INC.,

9                               Defendant.

10   ------------------------------------x

11                          March 2, 2004

                            2:00 p.m.

12

13        Deposition of EDNA SIRENA DUMAS, taken by

14   Defendant, pursuant to notice, at the New York

15   Palace Hotel, 455 Madison Avenue, New York, New

16   York, before SUZANNE PASTOR, a Shorthand Reporter

17   and Notary Public within and for the State of New

18   York.

19

20

21

22

23

24

25

1

2      Q.    And that began in approximately
3  1994?
4      A.    1994.
5      Q.    And since 1994 you had a
6  boyfriend/girlfriend type relationship?
7      A.    Yes, we did.
8      Q.    And did something occur at some point
9  in time where that boyfriend/girlfriend type
10  relationship changed?
11      A.    Yes, it did.
12      Q.    Tell the court what that was, please,
13  ma'am.
14      A.    In -- well, I came to Alabama to
15  visit him in August of 2003, and prior to that we
16  were on the phone, constantly on the phone a
17  lot.  And in September of 2003 he stopped, like,
18  slacked off calling.  And then he said your cell
19  phone isn't working so I'm not going to call
20  you.
21          So at that time my daughter Kimberly
22  called him and said, you know, you really should
23  call my mom.  You know how she works, she works a
lot of hours and the phone cannot pick up in all
of the areas that she works in because of the

```
 2      Q.      I think you said earlier that you
 3  owned a home at 207 Rosedon, is that correct?
 4      A.      That is absolutely correct, yes,
 5  sir.
 6      Q.      Do you still own that property?
 7      A.      Yes, I do.
 8      Q.      Is it for sale at this time?
 9      A.      Yes, I did put it up for sale.
10      Q.      When did you put it up for sale?
11      A.      On the 22nd of January 2004.
12      Q.      Who lived in that house from 1994
13  until the end of 2003?
14      A.      Theodore Davis.
15      Q.      Did anyone other than him live
16  there?
17      A.      I guess his women.  When I come
18  visit, everything would be nice.  I mean, nothing
19  would be visible for me to see.
20      Q.      So you didn't see anything that was
21  visible that anyone else was living there?
22      A.      Except Kotex and Tampons.  And hair
23  dryers.
24      Q.      Did you see anything else that would
25  indicate someone else was there?
```

```
 1
 2    A.   No, sir.
 3    Q.   Did Mr. Davis ever pay you any rent?
 4    A.   No, sir, he did not.
 5    Q.   So he never paid you any rent at all
 6  from 1994 through at least January of 2004, is
 7  that correct?
 8    A.   That's correct.
 9    Q.   Were you purchasing that house at
10  that time?  Were you making any payments?
11    A.   I paid for that house.
12    Q.   So it was paid for.
13    A.   I paid for that house.
14    Q.   Did you have any kind of agreement at
15  all with Mr. Davis as far as the payment of
16  rent?
17    A.   You know what?  He was so strapped
18  when he came to live in my house because he said
19  that they were just coming back off a strike from
20  Greyhound.  So he was so strapped, I didn't even
21  pressure him and I didn't even bother him.  So he
22  said in August of 2003 when I get my money, I'll
23  pay you what I owe you.  When I get my money from
24  Greyhound.
25    Q.   So he said he'd pay you what he owed
```

FOSHEE & TURNER COURT REPORTERS

Page 38

1
2  you.
3      A.    When he'd get his money from
4  Greyhound.
5      Q.    What did he owe you?
6      A.    I charged him -- if I was charging
7  him $500 a month for ten years, that would be
8  like $80,000.
9      Q.    Did he owe you?
10     A.    You know what? I tried to help
11 Mr. Davis out of the kindness of my heart and it
12 turned into something like this.
13     Q.    Did he owe you?
14     A.    You know what? How I felt about it,
15 let him take it and go on and have a happy life.
16     Q.    Can you again tell me the date that
17 you came to the property to ask Mr. Davis to
18 leave?
19     A.    January 19th, 2004.
20     Q.    Are you sure it wasn't February 19th,
21 2004?
22     A.    Absolutely not. I'm certain that it
23 was January 19th, 2004. February 19th he was not
24 in possession of my house. A "for sale" sign was
25 in the yard.

Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

```
 1
 2      Q.   Did you or your friends eat any of
 3 the food that was in that home?
 4      A.   No, sir.
 5      Q.   Did you or your friends use any of
 6 the furniture that was in that home?
 7      A.   No, sir.
 8      Q.   What did you do with the food that
 9 was in that home?
10      A.   Put it out in the garbage.
11      Q.   What did you do with the furniture
12 that was in that home?
13      A.   First of all, let me tell you about
14 the furniture. All that furniture was not his
15 furniture. Regardless of what he's saying, it
16 was not.
17      Q.   Who did it belong to?
18      A.   It was my furniture.
19      Q.   All of it?
20      A.   Not all of it. But enough of it.
21      Q.   Is some of it his?
22      A.   Yes. One or two pieces. Not enough
23 to even talk about. And it was all broken down
24 and raggedy.
25      Q.   Did you or your friends remove any of
```

FOSHEE & TURNER COURT REPORTERS

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

```
 1   that furniture and put it in the yard?
 2       A.   Did me or my friends, no, I did not
 3   touch it.  Nor did my friends touch it.
 4       Q.   Who put the furniture outside?
 5       A.   The moving company.
 6       Q.   And did you hire that company?
 7       A.   Yes, I did.
 8       Q.   What's the name of that company?
 9       A.   I don't have the papers here with me
10   now.
11       Q.   You don't remember the name of the
12   moving company?
13       A.   Absolutely not.
14       Q.   Did you know any of the people that
15   worked for that moving company?
16       A.   I don't know nobody.  I didn't know
17   any of them.
18       Q.   You didn't know any of the people
19   that worked for that moving company at all?
20       A.   Not at all.
21       Q.   Did your nephew or son know any of
22   the people that worked for that moving company?
23       A.   First of all, my son wasn't in the
24   area.  My nephew was in the area.  He didn't know
```

Note: Line numbers shown are approximate based on the source layout.

```
 1
 2   anybody.
 3        Q.   How many people came to remove the
 4   belongings from the house?
 5        A.   Two.
 6        Q.   Did they remove everything that was
 7   in there that was his?
 8        A.   Listen, the police told him to take
 9   what he wanted to take.  He took what he wanted
10   to take.  He called the police on me and the
11   police told him to take what he wanted to take
12   and he took what he wanted to take.
13        Q.   Did the police officer give him only
14   five minutes to take his items out of the house?
15        A.   No, sir.  They gave him longer than
16   five minutes.
17        Q.   How many minutes?
18        A.   Actually, the police said I think
19   I've been here an hour now or more, let's see if
20   he's ready to go.  And I don't know what he told
21   the police.
22        Q.   He was living there for ten years and
23   he was given an hour?
24        A.   But you have to understand everything
25   in that house was not his.
```

    Q.    Were there things that were left in that house that were his?

    A.    His family came and took things that belonged to him. They took everything that belonged to him. When it went on the street -- when I put it out, his daughter came, his baby's mama came, three trucks came and they picked it up. And the police was present when they were doing that. And Mr. Davis knows that the police spoke to him at that time because he called them and they told him, they said look, the police told him your family is getting your stuff, it's okay. So his family took. They had like four trucks and they took everything of his.

    Q.    What was the police officer's name?

    A.    I'm sorry, I don't know.

    Q.    Did you know that police officer before?

    A.    I have never seen any of these people in my life.

    Q.    Did you produce the deed to that police officer?

    A.    Yes, I did.

    Q.    And you just don't happen to know his

Page 46

```
 1
 2    had a food stamp letter and I had the deed.  So
 3    that's the way it went.  He called the police.
 4         Q.    How much time did you give him to get
 5    his items together before he was required to
 6    leave?
 7         A.    How much time did I give him?
 8         Q.    Right.
 9         A.    He had all the time he wanted to
10    have.  He had his things packed.  He had a bag
11    packed.  At that time when I came in he said he
12    was going to work.  So he had some clothes
13    packed.  And I did not bother him.  I sat in the
14    front room and he took his time.  I didn't rush
15    him.
16         Q.    Did he obtain most of his papers or
17    records or address books?
18         A.    That's all -- understand what he was
19    taking was papers and addresses -- I don't know
20    about addresses but he was getting all his papers
21    and he left there with quite of bit of stuff.  He
22    and his friend.  His friend came to help him.
23         Q.    Who was his friend that came to help
24    him?
25         A.    He said his name is Tommy.
```

```
 1
 2      Q.    Did Mr. Davis take any of his own
 3 family pictures, computer, personal records,
 4 receipts, videos, anything like that with him?
 5      A.    Again, I don't know.  I didn't
 6 supervise Mr. Davis.  He got what he wanted to
 7 get.
 8      Q.    Did he take his safe with him?
 9      A.    I don't know anything about a safe.
10      Q.    Did you ever observe a safe in his
11 house at all?
12      A.    Absolutely not.
13      Q.    Did you or your friends read any of
14 the personal or business papers that belonged to
15 Mr. Davis?
16      A.    I saw some of his papers in there.
17      Q.    Did you read them?
18      A.    I looked at them.  I couldn't read
19 them all.  I looked at them.
20      Q.    Which ones did you look at?
21      A.    Specifically, a disability check from
22 Greyhound.  A stub.  That was out on the
23 dresser.
24      Q.    It was a stub or the check?
25      A.    A stub.  I didn't see no check.
```

```
 1
 2      Q.    Did you make sure that he got that
 3 stub?
 4      A.    I never seen him anymore.  How am I
 5 going to make sure that he get that?
 6      Q.    Did you or any of your friends review
 7 any of the videos belonging to Mr. Davis that
 8 were in that house?
 9      A.    Look, the videos that were out there
10 I did not have time to look at those things.  I
11 just wanted to get them to his family and let
12 them see them.  Let them go ahead with them.  But
13 I did get a call that his daughter saw some of
14 the videos.  I'm not interested in that stuff,
15 you know?
16      Q.    Did you review any of them?
17      A.    No, sir, I did not.
18      Q.    Did any of your friends?
19      A.    His family.  Okay?
20      Q.    Did you give them to his family?
21      A.    I just put everything out there.  I
22 was not interested in -- I just wanted them to
23 get the stuff and go.
24      Q.    You put the videos and the other
25 business papers out on the street, is that
```

1
2  correct?
3      A.    Yes.  Absolutely.  His daughter was
4  there.  She was taking them and all of his
5  family.  So they had them.
6      Q.    Have you discussed any of his
7  personal business, either videos, business
8  papers, with anyone other than Clay Clark?
9      A.    Have I discussed it with anyone other
10 than?
11     Q.    Other than Clay Clark.
12     A.    With his sister.
13     Q.    That's the lawyer sitting across from
14 you now.
15     A.    Yes.
16     Q.    Who did you discuss it with?
17     A.    With his sister, for one.
18     Q.    Anyone else?
19     A.    There were people out there that saw
20 all of that stuff.  It was out there.
21     Q.    Well, I just want to know if you
22 discussed it with anyone else.
23     A.    Sure.
24     Q.    Who did you discuss it with?
25     A.    With my son, with my daughter.

1
2  written down but it was so many, I don't have
3  them with me.  If I had known that you would want
4  them, I would have brought them.
5       Q.   Have you ever signed a warrant
6  against anybody?
7       A.   Against Theodore Davis.
8       Q.   And what was that warrant for?
9       A.   Because the police asked him not to
10 come back to that property, don't come back to
11 this property.  And he came back.
12      Q.   Did the police do this of their own
13 volition or at your request?
14      A.   At their -- I mean, he kept calling
15 them and what they were telling him to stay away,
16 stay away, stay away.  And it wasn't --
17      Q.   He called the police --
18      A.   He kept calling them.
19      Q.   They said stay away.
20      A.   The police said stay away.
21      Q.   How could he get his furniture and
22 belongings that were on the street?
23      A.   His family came down and they picked
24 them up.  His daughter was there.  He had like
25 four trucks.

```
 1
 2       Q.    Was Mr. Davis arrested because of
 3  your complaint?
 4       A.    Yes, he was.
 5       Q.    You signed a warrant for his arrest,
 6  is that correct?
 7       A.    That's correct.
 8       Q.    You made a complaint, did you not?
 9       A.    Yes, I did.
10       Q.    Did you and Mr. Davis ever live
11  together?
12       A.    We never lived together but he was
13  with me, I was with him, we were back and forth,
14  back and forth, back and forth and back and
15  forth.
16       Q.    I think you testified earlier that
17  that was three or four times a year, is that
18  correct?
19       A.    Uh-huh.  And he had my things in his
20  house -- in my house.  He had my things.  I
21  practically furnished that house.  And what
22  belonged to him his family took.
23       Q.    But you only visited with him three
24  or four times a year, is that correct?
25       A.    Yes.
```