March 19, 2004

On January 19, 2004, a moving van arrived at the residence of then Theodore Davis on Rosedon Dive at approximately 9 or 9:30 in the morning. The moving men started moving furniture on the street; they put a few things in the moving truck. People in the neighborhood started stopping by and taking things. A policeman can and started talking to the lady in the house he had a bag in his hand and took something to the trunk of his police car. People were stopping by all day, later that night a wrecker came and pulled a car from the driveway that was parked near the privacy fence.

Veronica Thomas

State of Alabama, County of Montgomery

On this _19th_ day of _March_, 2004, personally appeared before me the said named _Veronica Thomas_ to me known and known to me to be the person described in and who executed the foregoing instrument and she acknowledged that she executed the same and being duly sworn by me, made oath that the statements in the document are true.

Signed_____
Notary Public

SEAL                          My commission expires: _08/17/04_



4       So she said, you're going to get out of
5    here. I have the deeds to this house. You
6    don't have any proof at all. And I said,
7    oh, yes, I do. I said, I know I've been
8    living here, I said, and you're not going
9    to put me out of here like this. I said,
10   what are you trying to do?
11       So the guys came in I guess as a
12   threat. And so I said, well, I'm going to
13   call the police. Well, you call the
14   police. The police can't do anything about
15   this because I've got my proof right here.
16       So I think at that time, I think I did
17   call the police. And so she told me I had
18   to get out. While he was on his way, they
19   were still telling me to get out of the
20   house. And I told them -- I said, I'm not
21   going anywhere, I said, and we'll
22   straighten this out. I said, you guys are
23   going to get out of here.

0                                                    61

1       So the police came, and so we told the
2    police what was going on. And so she had
3    the deed, and she handed him the deed. And
4    so I told him, I said, yeah, but she has
5    the other paperwork, too, I said, because
6    I'm buying this from her. And she made --
7    he's not buying a damn thing from me. And
8    this is my house, I have the deeds, and I
9    have the right to put him out.
10       So I said, well, even if that were so,

Page 47

06-15-2004 TDavis.txt

11    you don't have the right to put me out.  I

12    said, I don't have to go anywhere right

13    now.  I said, you would have to go through

14    a procedure to put me out of here.  I said,

15    but I don't want any trouble.  I said, I've

16    got good neighbors.  I don't even want them

17    to know what's going on.  She said she

18    didn't give a damn about that; all she

19    wanted was my ass out.

20        So the nephew was in the background,

21    telling me I had to get out, and he was

22    threatening.  So because of her and my

23    relationship, I didn't say a thing to him.

62

▯

1    I just let him talk.

2        And then I got phone calls from the

3    daughter.  The daughter called and said,

4    what's this?  You remember telling me

5    that -- at one time that you were buying

6    this house from my mom?  Because she had

7    given me a lot of problems before.  So I

8    just told her what was happening.  I said,

9    now, your mom and I had an agreement.  I'm

10    buying this house.

11        And so on the phone, she reminded me of

12    that.  She said, you remember telling me

13    that you were buying the house from my

14    mom?  Well, what's this stuff about?  My

15    mom has the deeds to the house, and my mom

16    said that she owns the house.  And so she

17    said, you're going to get yours, so on,

Page 48

156

Q. And how long had you lived in Rosedon Drive?

A. From 1994 -- I don't remember the month. 1994 to January -- I mean, January 18th of this year.

Q. And where did you live before that, sir?

A. I lived on 117 National.

Q. And what --

A. In Montgomery. That's --

Q. Where about is that?

A. That's right off of -- off of -- what's the main street?

Q. You mean like downtown or --

A. Uh-huh. It's right over off of Cleveland Avenue.

Q. All right. And about how long did you live there, sir?

A. About eight years.

Q. About before that, where did you live, sir?

A. In Cloverland Shopping Center -- Apartments. Cloverland Apartments.

Q. And about how long there, sir?

A. I guess about eight years.

Q. And that's fine. Just approximately. And

168

the police report on the telephone
conversation I had with the lady, when I
asked her to send the police to meet me, she
said meet them at the house, and I told her,
I said, no, I don't want to do that. I said
I'd rather wait somewhere else. And she
said -- and the lady on the phone said, okay,
well, can you wait at a neighbor's around the
corner? And I said, yes, I'll do that. And
I did. I waited up the street at a
neighbor's house until the police came by,
and then I went. The police parked in front
of the door and I parked behind it. And then
they saw me, Officer S. J. Watts.

Q.  Now, Officer Watts --

A.  Officer Watts was --

Q.  -- was the officer who was with you --

A.  When I went to the house.

Q.  -- on the night --

A.  On the night that this happened. On the
18th. That -- that was the same day that I
was evicted.

Q.  All right, sir. Again, help me if you

170

that was the trespassing incident.

And then I was also -- in Birmingham, about three weeks later, I got a letter from the Sheriff's Department there.  And she had said that I had said -- told her daughter in a -- in a telephone conversation that I would kill her and that the neighbors had told her --

Q.   Would kill whom?

A.   Ms. Dumas.

Q.   All right, sir.  I'm sorry.  Let me see if I've got the sequence of events.  About 8:30 in the morning, the incident occurred that you've described --

A.   Occurred, uh-huh.

Q.   -- previously?

A.   Yes, sir.  But, now, this policeman who came that morning was not the same one.  This one here is the one that came on the 18h that night and on the 19th.

Q.   Okay.  Let me see if I can -- and I apologize.  I'm, afraid, trying to gather all this information; I'm getting my dates and

171

```
 1              days messed up.  The first incident is at

 2              about 8:30.  How long did that last, just

 3              approximately?

 4       A.     Oh, gosh.  It seemed like a lifetime, but I

 5              assume I didn't even stay there 40 minutes,

 6              because they gave me five minutes to leave.

 7              But with everything happening and stuff, I

 8              know it was -- I stayed there 20 minutes I

 9              know trying to get what I could, because he

10              threatened me and told me he'd put me in jail

11              if I didn't hurry and get out.

12       Q.     And you said that officer was not Mr. Watts?

13       A.     Not the same, no, sir.

14       Q.     Can you describe -- was it one or more

15              officers?

16       A.     Just one officer.

17       Q.     And how would you describe that officer?

18       A.     He was a black officer.  I didn't pay him any

19              real attention.  I couldn't remember much of

20              anything that morning.  I was really just

21              trying to figure out what I was going to do

22              next, you know, because of him putting the

23              pressure on me telling me that I had to
```

June 17, 2004

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 174

1  Q. Ms. Dumas?
2  A. Ms. Dumas and two other -- from what I saw,
3     there was only two other guys with them. So
4     there was a total of four that I saw.
5  Q. And they appeared to be friends of the nephew
6     or Ms. Dumas?
7  A. I don't know who they were friends of. I
8     didn't know them. But, you know, they all
9     came in and they were all yelling. Well, the
10    two that I -- that came in. I -- they didn't
11    say anything. It was just she and her
12    nephew. And they were the ones who were
13    yelling get out, get out, you got to get out,
14    it's time for you to go.
15 Q. All right. Now, when did Mr. Hardy arrive?
16 A. I guess it may have taken him six or seven
17    minutes or so. He got right there really
18    quick there. It wasn't long at all.
19 Q. And his first name is?
20 A. Thomas.
21 Q. Okay. Does he live in the same area?
22 A. No. He -- he -- he lives in the Twin Gates
23    area. But I -- when I called him -- I don't

Page 175

1     remember whether he was on a cell phone or
2     where I called him, but he got there
3     fairly -- pretty fast.
4  Q. If you would help me, where is Rosdon? Is it
5     Rosdon or Rosedon?
6  A. Rosedon. It's right off Woodley Road. You
7     go down Woodley Road to Peter Crump School,
8     and it's right there -- that subdivision
9     right there right at that light a block from
10    Peter Crump. It's the -- Spring Valley.
11 Q. Okay. That would be the neighborhood. I
12    gotcha.
13 A. Uh-huh.
14 Q. After Mr. Hardy arrived, about how long were
15    you there?
16 A. Maybe ten or 15 minutes.
17 Q. Fair enough. Now, was the police officer --
18    just one police officer there the entire
19    time?
20 A. Yes, sir.
21 Q. Did any charges arise out of that 20 to 40
22    minute confrontation with Ms. Dumas?
23 A. No, sir.

Page 176

1  Q. And when you left the house on Rosedon, where
2     did you go?
3  A. To Mr. Hardy's house.
4  Q. And about how long did you stay there, sir?
5  A. I stayed there about three or four hours, I
6     guess, until I decided that there were -- I
7     needed to go back and get the money out of
8     the safe and my medicine that I had left.
9  Q. And that's when you called the police to
10    assist you in going and making the entry?
11 A. Yes, sir.
12 Q. And then that's when you first saw --
13 A. Mr. Watts.
14 Q. Mr. Watts. And, I'm sorry. Is 5:18 p.m., is
15    that the time you arrived or when you called
16    him when you first saw him?
17 A. I'm not sure. It might have been the
18    time -- I'm -- I think it probably -- he put
19    it down at the time that I called. I'm not
20    sure.
21 Q. All right. Is that Lieutenant Signore?
22 A. Yes, sir. He's the one I saw yesterday who
23    told me if I needed any other information,

Page 177

1     that I could call this number and maybe he
2     could help me.
3  Q. Okay. Is he some sort of supervisor --
4  A. Yes, sir.
5  Q. -- for that division? And how would you make
6     contact with Lieutenant Signore?
7  A. I went down and requested the information on
8     the incident for that -- for my arrest. And
9     they didn't have anything on the morning of
10    that. The only thing they had was the arrest
11    thing. That's all that they found. They
12    didn't have anything on the -- I guess on the
13    call that morning or anything. This was all
14    that I was able to get was the -- the arrest
15    portion of it.
16 Q. Did they give you a report on the arrest?
17    MR. ROUNTREE: Yes. George has got
18    it. He took it to make a copy.
19    He's going to bring it back.
20    MR. SHEEHAN: Thank you.
21 Q. I guess that report is going to say about how
22    long --
23 A. It doesn't -- from what I could see, it

9 (Pages 174 to 177)

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

June 17

**Page 178**

1     didn't have how long I stayed in there.
2        MR. ROUNTREE: It's a very poor report.
3   Q. Prepared by Mr. Watts, I guess?
4   A. Maybe. I'm not sure, because -- no, sir, it
5     was not. It was -- because what happened was
6     I -- we never could find out who it was who
7     made the actual report and put -- had me put
8     in jail. We never found out who that was. I
9     don't know who it was. Because when I went
10    to try to get some help from the police
11    on -- on the 20th, I think it was -- let's
12    see. 18th, 19th. On the 20th, I went down
13    to a couple of lawyers and asked questions
14    about what I could do to get my belongings
15    out of the house. They said it was a civil
16    matter and it would be a lot of work. And so
17    they suggested that I go to the County. So I
18    went to the County and I asked them. They
19    said they couldn't do anything because it was
20    a civil matter. I went to the police
21    department --
22   Q. Now, when you say you went to the County,
23    would that be the Sheriff's Department?

**Page 179**

1   A. Yes, sir, uh-huh.
2   Q. I'm sorry.
3   A. I went to the police department then on
4    Ripley and I requested their help. And the
5    young lady stated that she could not do
6    anything for me, but that she had some sad
7    news for me; that I would be retained because
8    there was a warrant for my arrest for
9    criminal trespass.
10   Q. Is that first time that you learned that she
11    had sworn out a warrant for you?
12   A. Yes. Well, they had mentioned it the
13    night -- you know, when the police and I went
14    in that night before, they had mentioned it,
15    because he had told her that she had the
16    right to do it. But I didn't know whether
17    she would or not because she kept yelling,
18    I'll put you in jail, I will put you in jail;
19    but I didn't know that she, you know, would
20    go through with it.
21   Q. About how long did the incident with Officer
22    Watts -- how long did that take?
23   A. After we initially went into the back door

**Page**

1   and I stepped out, I guess it was a matter of
2   15 minutes. Because after he heard whatever
3   it was she told him, he kept telling me be
4   quiet, be quiet, don't say anything, listen
5   to me. And then he told me you've got to go,
6   she's only going to give you your medicine.
7   And I told him, I said, well, sir, I got
8   other things in there I need to get. I said,
9   I need -- I said, walk with me -- walk
10   through here with me, let me get what I need
11   to get and then I'll leave. Sir, you're not
12   going in there. She doesn't want you in
13   there, you're not -- I said, I live here.
14   These are my things. I said they're sitting
15   on -- eating my food and sitting on my
16   furniture, and i -- and these are strangers
17   going through everything I have. They went
18   through it piece by piece and threw away or
19   kept whatever they wanted to keep. These are
20   things that were mine. I'm an adult.
21   Whatever I had in there was mine. And they
22   went into the safe. The pictures that were
23   shown yesterday, now, some of those I didn't

**Page**

1   know anything about. I had -- you know,
2   because I have other roommates who had lived
3   with me through the years. But the ones that
4   I did recognize were in my safe. And so I
5   know she had to have gone into my safe to get
6   those.
7   Q. When you went in with Officer Watts that
8   Sunday evening, did you see the safe?
9   A. I wasn't able to go in.
10   Q. Okay.
11   A. I was in the kitchen at the back door, and I
12   wasn't allowed to go in.
13   Q. Were the nephew and his two friends still
14   there Sunday evening?
15   A. The nephew -- I didn't see anybody but she
16   and the nephew. They were the ones who came
17   rushing in cursing the police and me out.
18   And so they were -- they were the only ones
19   that were there.
20   Q. That Sunday evening?
21   A. That Sunday evening.
22   Q. All right, sir. You stayed there about 15
23   minutes give or take?

10 (Pages 178 to 181)

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 3
ph: (334) 263-0261; fax 26

June 17, 2004

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 182

1  A. Yes, sir.
2  Q. And then where did you go, sir?
3  A. I went back around the corner to a friend of
4     mine, Ms. Vaughn's house. She lived
5     around -- she lived on 207 Riding Avenue.
6     And I went around to her house to wait for
7     the police to pass by so I could tell him my
8     money was in there so he could take me back
9     to get it, but he never showed up.
10 Q. Is that where he had met you?
11 A. That's -- he was the one who was called, and
12    that's where he met me, at the house,
13    uh-huh. And so I waited for him to come back
14    by so I could stop him, but he never did show
15    up. So I asked her if she would take me
16    around that way. So she took me around. And
17    when she took me around, he was standing
18    there watching the movies with Ms. Dumas and
19    all. That's why --
20 Q. The police officer?
21 A. The police officer. That's why he was there
22    and had not left. She had shown him quite a
23    few of the movies and stuff, and he was

Page 183

1     watching them with her.
2  Q. At night?
3  A. And then we went -- yes, sir, that night.
4     After I -- after they made me leave. And so
5     we went up the street, came back by to make
6     sure that that's what we saw. And so -- so
7     we slowly went on by, and then I left and
8     went on to Birmingham after he had told me if
9     I come back, they would arrest me.
10 Q. I'm sorry. Ms. Vaughn's name is?
11 A. Jennifer Vaughn, uh-huh.
12 Q. Now, is she -- was she a neighbor?
13 A. She was a neighbor, uh-huh. Yes, sir.
14 Q. All right. When you left the house, did you
15    have transportation or did you have to borrow
16    someone's car?
17 A. No. I had -- I had my car. Now, I had left
18    one in the yard. I had two cars. I
19    had -- one was left in the yard that she had
20    pulled in. She had that one --
21 Q. What make and model was that, sir?
22 A. It was a '93 Mercury Grand Marquis.
23 Q. And the one you were driving was a --

Page 184

1  A. '84 Lincoln Mark VII.
2  Q. So when you drove by, you were in the '84
3     Lincoln --
4  A. No, sir. I was in Ms. Vaughn's car.
5  Q. Okay. And after driving by, about what time
6     was that, sir?
7  A. Gosh. This was about five something. So I
8     guess it had to be somewhere around six or
9     something. I'm not sure. It -- it was dark,
10    though. It had gotten dark.
11 Q. And where did you go then, sir?
12 A. I left her house and went to my sister's in
13    Birmingham.
14 Q. So that evening, you drove to Birmingham?
15 A. Yes, sir.
16 Q. And I'm sorry. You probably gave us the name
17    of your sister, but your sister --
18 A. Mary Drake.
19 Q. And she lives at --
20 A. 5608 Terrace J, as in John.
21 Q. The letter --
22 A. Just the letter J, uh-huh. And that's
23    Birmingham, Alabama.

Page 185

1  Q. Okay. And her telephone?
2  A. 35208 is the zip.
3  Q. And her telephone number is?
4  A. 205-924 -- I'm -- I'm sorry. 923-4432.
5  Q. 4432?
6  A. Yes.
7  Q. How long did you stay there at 5608 Terrace?
8  A. From that day until today. I'm still there.
9  Q. Oh, I'm sorry. You spent the night there?
10 A. Yes, sir.
11 Q. Did you come back to Montgomery the following
12    day?
13 A. Came back -- no. The following day was when
14    the incident happened. I couldn't come back
15    because they told me they'd put me in jail if
16    I came back. So I wasn't -- I didn't come
17    back.
18 Q. Was it Officer Watts who told you he was
19    going to put you in jail?
20 A. Both officers. The one that morning of the
21    18th that came out told me if I came back,
22    that they would have to arrest me.
23    And -- and then -- but he did say that if I

11 (Pages 182 to 185)

June 17, 2004

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLC., ET AL.

Page 186

1  needed to come back, call an officer and they
2  would probably send somebody to come back
3  with me if I needed to come back. But I had
4  to leave or he would put me in jail that
5  morning. Okay. And then I called Officer
6  Watts, and he -- after her -- hearing
7  Ms. Dumas and she had the deeds and all of
8  this, to the house, and then he told me that
9  I had no rights and that I had to leave and
10  that if I came back, that I would be
11  arrested.
12  Q.  Can you describe Officer Watts for me?
13  A.  He was a black officer also. I guess he
14  might have been about six-two, three -- I'm
15  not sure, really -- and about 200 or so
16  pounds.
17  Q.  Did he say he had had any communication with
18  the officer from the morning?
19  A.  No, sir.
20  Q.  Do you think he had any knowledge of what had
21  taken place that morning?
22  A.  I doubt it. I doubt it. I don't think they
23  did. Because that was early morning and this

Page 187

1  was that afternoon.
2  Q.  So probably a different shift?
3  A.  Yes, sir, uh-huh.
4  Q.  So Monday morning, about what time did you
5  get up at your sister's?
6  A.  It was early, because I couldn't really
7  sleep. I didn't really get any sleep that
8  night. So I remembered getting a call from
9  my daughter's sister. Yes, it was my
10  daughter's sister. We -- I don't
11  have -- she's not my child. Okay.
12  Q.  And her name is?
13  A.  Linda Grant.
14  Q.  And where does she live, sir?
15  A.  She lives here in Montgomery.
16  Q.  At --
17  A.  And I don't know her address, but it's in
18  Spring Valley in the same area around the
19  corner from where I was living. But she's on
20  Spring Valley Drive.
21  Q.  All right. And your daughter's name is?
22  A.  Aliya Bryant.
23  Q.  And where does she live, sir?

Page 188

1  A.  She lives in Birmingham.
2  Q.  And the address there is?
3  A.  I don't know her's either right offhand. But
4  I received the call from Linda. And she had
5  stated that I needed to get down here because
6  my things were being put out on the street.
7  And so I told her I couldn't come because
8  what he had told me, I would be arrested.
9  And I said, well, is there anything that you
10  can do? So she can -- so I guess there
11  wasn't anything she could do.
12  But I didn't know that they had talked
13  to my daughter, too. And my daughter had
14  gotten some people and they were on their way
15  down here to try and retrieve whatever they
16  could, whatever help they could give.
17  Because after she heard it, that's what she
18  did, she just came on.
19  Q.  Okay. Now, I'm sorry. Ms. Bryant from
20  Birmingham --
21  A.  My daughter, uh-huh.
22  Q.  -- came down?
23  A.  Came down.

Page 189

1  Q.  All right, sir. Did you ride with her?
2  A.  I did not. I never came -- I never left -- I
3  haven't been in that area since it happened.
4  I -- she -- I stayed in Birmingham.
5  Q.  All right. Did Ms. Grant go by?
6  A.  She helped Ms. -- she helped my daughter to
7  get whatever they could get.
8  Q.  Okay. So Ms. Grant and Ms. Bryant went to
9  the house on Monday?
10  A.  Yes, sir.
11  Q.  About what time did they arrive?
12  A.  I don't know. I -- I couldn't tell you,
13  because I really didn't even know my daughter
14  had come until later on when I found out she
15  had come and tried to retrieve whatever she
16  could for me.
17  Q.  Okay. And what did they -- what were they
18  able to get?
19  A.  They were able to get my bedroom suite -- the
20  master bedroom suite. They got most of it.
21  It was damaged quite badly, but they did
22  get -- get it on the truck, because it was
23  just them and a couple of people helping

June 17, 2004

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 190

1  them. And they got a couple of pieces of my
2  grandmother's antique dinette. And I guess I
3  got a pair of shoes or something like that,
4  and that's about it. They got little shirts
5  and stuff like that that they could get. But
6  I didn't get anything any more than that.
7  Q. Okay. When did they get that stuff?
8  A. That day. That was that Monday.
9  Q. Okay. About what time?
10  A. I don't know. I don't even know what time
11  they got there or were there. Because, like
12  I said, I didn't even hear about her being
13  there until later on that day.
14  Q. About what time did you hear that she was
15  there, Ms. Bryant?
16  A. That evening. I guess it was afternoon about
17  three or four o'clock, I guess, something
18  like that.
19  Q. And when she called -- did she call you?
20  A. I don't remember. I don't remember how I
21  found out she was there.
22  Q. Okay. But about three or four o'clock, you
23  had some word from Ms. Bryant?

Page 191

1  A. Had some word that -- uh-huh, that she had
2  tried to get some things, uh-huh.
3  Q. And what did she say?
4  A. I don't even remember who it was that told
5  me. I'm at a loss for that. Really, at that
6  point, I don't know who told me, but I
7  remember their saying that my daughter was
8  there, she had tried to get certain things.
9  And I don't remember if she's the one called
10  me or who called me. You know, because I was
11  really trying to visualize everything in the
12  house sitting on the street and people coming
13  and stuff. So --
14  Q. Sure. What was your daughter's cell phone
15  number?
16  A. I don't have it.
17  Q. Okay.
18  A. But I can get all of that for you.
19  Q. And, I mean, that might help us with
20  the timing, anyway.
21  A. Okay.
22  Q. What about Linda Grant's telephone number?
23  A. I don't know that either. I think she's in

Page 192

1  the book, I think.
2  Q. Okay. Did she have a cell phone as well?
3  A. I don't know.
4  Q. Could you get that information to your
5  lawyer?
6  A. Okay.
7  Q. Thank you, sir. And, again, what that will
8  do is help us with the chronology of events.
9  A. Okay.
10  Q. So when did you next hear from anyone, say,
11  after the call from Linda Grant advising you
12  that they were moving your stuff out?
13  A. I don't remember hearing from anyone after
14  that. But I remember making a call myself.
15  I made a call to a few people. But I know I
16  got in touch with one lady who had went to
17  therapy with me who I had met in therapy.
18  And I called her because I couldn't -- I
19  don't remember who else I tried to call, but
20  I couldn't get anybody. But, anyway, I
21  called her and asked where she was in the
22  area, and she told me. I said, well, will
23  you please do me a favor. And I tried to

Page 193

1  tell her what was going on. I asked her,
2  will you please go by there -- because I
3  didn't know if anybody then -- and I didn't
4  know my daughter had went or anything -- and
5  I said, and see -- maybe see what's going on
6  for me. And so she said, okay. And
7  she -- her name is Crum. Marie Crum. And
8  she said that she would go by and see what
9  she could see. And she got there and she
10  called me and she said, Ted -- she said,
11  Lord, she said she felt sorry for me. She
12  said this is ridiculous. She said all of
13  your stuff is out in the yard and she said
14  there were people all over the place. And so
15  she said that -- so I said, well, can you try
16  to stop them while I call the police. And
17  she said, well, a policeman is already here.
18  And so I said, well, can I speak to the
19  officer. So she said, okay, and she called
20  him. She called him and she said, sir, can
21  you come here for a minute. He came over,
22  she gave him the phone. And I told him, I
23  said, well, sir, I said, I'm -- my name is

13 (Pages 190 to 193)

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL. 36104
ph: (334) 263-0261; fax 263-1243

June 17, 200-

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 194

1  Ted Davis. I said, that's my stuff. I said,
2  can you please stop them from getting it.
3  And he laughed and said, sir, I don't see
4  anybody getting anything. Everything is
5  okay, you know. And -- and so I said, okay.
6  And he gave the phone back to her, Ms. Crum.
7  And she told me, she said, Ted, he's lying.
8  She said, there's trucks in your driveway,
9  people are putting stuff on the trucks. She
10  said, there's a lady that just grabbed a
11  bottle of liquor or something -- a lady or
12  child or something -- and just ran across the
13  street with a bottle of liquor. And people
14  are going through the bags and putting bags
15  on the truck now. And then that's when I
16  told her to go up and take -- asked if she
17  saw my neighbor Mr. Johnson. And she said
18  yeah. And I said, will you go and see if
19  he's there and if he is, let me talk to him.
20  And I went -- and she took it up there and
21  asked him if he was Mr. Johnson and he said
22  yes. I talked to him and I -- and he said,
23  well, Ted, I tried. He said, but every time

Page 195

1  anybody tries to do something like that, says
2  she yells and tells them that it doesn't
3  belong to anybody and -- and they can get
4  what they want. And so that's what she had
5  told my daughter, also, that -- you know,
6  that it didn't belong to them and the people
7  could get it.
8  Q. And that would be Ms. Bryant?
9  A. My daughter. She had -- no, Ms. Bryant is my
10  daughter. Ms. Dumas told my daughter and her
11  sister -- she told the people that nothing
12  belonged to them. See, because my daughter
13  was telling them this is my father's stuff.
14  And she came out and told them, no, don't
15  listen to them. This -- nothing belongs to
16  them, get what you want.
17  Q. Telling the neighbors that?
18  A. Telling the neighbors and anybody who was
19  stopping. Because the neighbors had called
20  other people or their family. And from what
21  I understand, they had called other people in
22  to get things.
23  Q. So it was kind of take-as-catch-can, I guess?

Page 196

1  A. Get whatever you want.
2  Q. Now, Mr. Johnson is Mr. --
3  A. Don Johnson.
4  Q. And he was a neighbor --
5  A. He was two doors up from me. There was a
6  house between his and mine.
7  Q. Now, did you talk to him?
8  A. I've talked to him several times since then.
9  You mean that day?
10  Q. Yes, sir.
11  A. Yes. I talked to him because he's the one
12  who told me he had went down to try to see
13  what he could do but said that she was
14  telling everybody to get it and there was
15  nothing anybody -- you know, nobody
16  could stop them after she told them that.
17  Q. All right. Now, is Marie Crum, was she also
18  a neighbor?
19  A. She was -- she had went to therapy with me.
20  I had -- you know, when I was injured, we
21  both had therapy together. And we kept in
22  contact to see what kind of progress we were
23  making with our injuries. And so after I

Page 197

1  couldn't get anybody else -- I didn't hear
2  anything from anybody else, I called her and
3  asked her if she could go by.
4  Q. And where does she live, sir?
5  A. I don't know. I have her phone number
6  somewhere, too. I can get that for you.
7  Q. All right. And, I'm sorry. Your cell phone
8  number is?
9  A. I don't use it enough. It's my sister's cell
10  phone. But I can get you all these cell
11  phone numbers.
12  Q. Again, that's going to help us as far as the
13  chronology of events.
14  A. Okay.
15  Q. Now, when you spoke to Ms. Crum, she's the
16  one who went and got Mr. Don Johnson?
17  A. Yes, sir.
18  Q. Okay. And then you spoke to Mr. Don Johnson?
19  A. Spoke to Mr. Johnson.
20  Q. And about what time? Again, I guess the cell
21  phone records are going to help us as far as
22  timing, but, day, night?
23  A. I don't -- it was -- it was -- it was during

14 (Pages 194 to 197)

Dunn, King & Associates          431 South Court Street          Montgomery, AL 361-
toll-free (800) 359-800(          www.dunnking.com               ph: (334) 263-0261; fax 263-1-

June 17, 2004

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 198

1    that day.
2  Q.  All right, sir.
3  A.  It was during that day, because --
4        MR. ROUNTREE:  Is that it?
5        THE WITNESS:  That's mine.
6  A.  Okay.  My phone -- my cell phone number is
7     205-790-3457.
8  Q.  And that's with what service?
9  A.  Verizon.
10  Q.  And how long have you had that number, sir?
11  A.  This is my sister's phone.  It's not mine.
12     She just wanted me to travel with it since
13     this incident.  I've only taken it whenever I
14     needed it because she wanted to keep up with
15     me.
16  Q.  Now, would that be the phone that you were
17     using?
18  A.  Either that or the house phone.  I don't know
19     which one it was.
20  Q.  And I'm sorry.  The house phone number is?
21  A.  205-923-4432.
22  Q.  And that's with what service?
23  A.  I guess it's Bell.  I'm not sure.

Page 199

1  Q.  It's a home landline?
2  A.  Yes.
3  Q.  But these are both your sister's numbers?
4  A.  Yes, sir.
5  Q.  And they would be listed under?
6  A.  Mary Drake.
7  Q.  Mary Drake.  And how many kids does your
8     sister have?
9  A.  She has one, one son.
10  Q.  And he lives where?
11  A.  He lives with her.
12  Q.  And he's how old?
13  A.  He's 30 -- about 33.  He works for Social
14     Security.  He's a computer operator.
15        MR. ROUNTREE:  One second.
16        (Off-the-record discussion)
17  Q.  Ms. Crum, while present there on that Monday
18     afternoon, while speaking to you, handed the
19     phone to a police officer?
20  A.  To a police officer.
21  Q.  Did the police officer identify himself?
22  A.  Not that I remember.  All I did was when
23     I --I knew it was him because I asked

Page 200

1     if -- if I could speak to the police officer
2     and she called him over.  And I assume that I
3     just knew it had to be, you know, him.  But I
4     don't know if he identified himself or not.
5  Q.  Do we believe that's the same officer,
6     Officer Watts?
7  A.  Yes, sir.  Because I think that Ms. Crum
8     had -- I -- I think she had mentioned that
9     she thought that that was his name.  And so
10     when I got that yesterday, it kind of
11     verified that she did have the right one.
12  Q.  So Officer Watts had been there the night
13     before?
14  A.  The night before.
15  Q.  And then the following day was there?
16  A.  Yes.
17  Q.  Would he have been in uniform?
18  A.  Yes, sir.
19  Q.  I wonder if it was the second shift.  Then it
20     would be the afternoon shift that he was
21     there.
22        MR. ROUNTREE:  The shift changes about
23        2:30, three o'clock.

Page 201

1  A.  Well, my -- I had called him the night
2     before, which was on the 18th.  But my
3     daughter called him on the 19th because they
4     didn't want any confrontation, because they
5     were cursing them out about getting -- trying
6     to get something.  And so they didn't want
7     any confrontation.  So, from what I
8     understand, they called the police department
9     and asked them to send an officer out, and he
10     was the one that they sent back.  So he had
11     some long hours, I guess.
12        MR. ROUNTREE:  Let's go off the record
13        a second.
14        (Brief recess)
15  Q.  Sir, I understand Ms. Crum handed the phone
16     to a police officer whom we understand was
17     Officer Watts, the same officer.
18  A.  Yes, sir.
19  Q.  Did the voice sound the same?
20  A.  Yes, sir.
21  Q.  Did he identify himself?
22  A.  No, sir.
23  Q.  Okay.  But from the voice, it appeared to be

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 36104
ph: (334) 263-0261; fax 263-1243

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION. LLN.. ET AL.

June 17, 200

Page 202

1    the same officer --
2  A. Yes, sir.
3  Q. -- who had been there the day -- the night
4    before?
5  A. Who I talked to on the 18th, yes, sir. But
6    at the time when I first initially talked to
7    him, I did not relate him to that. I thought
8    it was familiar, but I didn't relate it to
9    him until later. And then I thought about
10   it, yes, after everything had went down, I
11   said that was the same voice, you know. But
12   initially I did not relate them.
13  Q. All right, sir. So this is January the 19th,
14   Monday, that you're talking with Ms. Crum and
15   this police officer?
16  A. Yes, sir.
17  Q. All right. And do you -- was it the
18   afternoon or the morning; do you recall?
19  A. It was -- I guess it was mid-morning, because
20   that's when I initially found out. And I
21   think it was mid-morning.
22  Q. All right. And then -- mid-morning, ten,
23   10:30 or so?

Page 204

1    speaking with her, and she hung up and that
2    was it. That's the last I talked to her
3    until I got in touch with her to write this
4    letter for me.
5  Q. All right, sir. Now, that's the morning of
6    Monday the 19th. What happens next
7    that -- that afternoon or noon or --
8  A. I didn't do anything else. After that I -- I
9    just -- just didn't know what else to do. So
10   that whole day went, and I just waited for
11   the next day to is when I came down, because
12   I was thinking what's my next step, which was
13   to come down here and try to get my safe, to
14   get in the house. So I was going -- I went
15   to lawyers to see if there was any paperwork
16   I could get to get into the house. They told
17   me that I had -- it was civil, they couldn't
18   do anything and that I had to go to the
19   police. So I went to the County to the
20   Sheriff's Department. Then I went to the
21   City. And that's when I was arrested.
22  Q. All right, sir. Let me see. And, again, I'm
23   sorry, but if I keep things in chronological

Page 203

1  A. Yes, sir.
2  Q. On Monday the 19th?
3  A. Uh-huh.
4  Q. All right. And then what's the next thing
5    that happens?
6  A. That's when she took the phone up to
7    Mr. Johnson. And -- and he talked to me and
8    told me that there was nothing that he could
9    do because of her telling everybody that they
10   could -- it was a free-for-all. And then,
11   while I was talking to him, I heard Ms. Crum
12   in the background, and she stated, oh, I wish
13   I had a camera. She said, she's walking out
14   with the police officer and he has a bag in
15   his hand. And he put -- he put a bag in the
16   trunk of his car.
17  Q. Of --
18  A. Of the patrol car.
19  Q. And then what happened, sir?
20  A. And then she gave the phone -- Mr. Johnson
21   gave the phone back to her and I told her
22   thank you for what she had done and that I
23   would be getting in touch with her again and

Page 205

1    order, my feeble brain can keep things
2    together. Monday, did you have any other
3    telephone calls, Monday, the 20th -- January
4    20th or contacts with anyone?
5      MR. ROUNTREE: Monday would have been
6      the 19th.
7  A. It would have been the 19th.
8  Q. I'm sorry. I probably misspoke. You're
9    right. The 19th.
10  A. No, sir. not that I remember. I -- I
11   don't -- I probably did have some, but after
12   I heard about what was going on, I -- I
13   really can't remember what went on that day.
14  Q. All right, sir. So we've now discussed
15   everything that you recall on Monday the 20th
16   of January?
17  A. Well, I went to the police department and I
18   was in jail on the 20th. Yes, that's when I
19   was arrested.
20      MR. ROUNTREE: Monday was the 19th.
21      MR. SHEEHAN: I'm sorry. I apologize.
22      I wrote down the 19th. I wrote
23      down the wrong date.

16 (Pages 202 to 205)

Dunn, King & Associates
toll-free (800) 359-8001

431 South Court Street
www.dunnking.com

Montgomery, AL 3610-
ph: (334) 263-0261; fax 263-124:

June 17, 2004

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

Page 206

1    Q. So that I'm clear, then, we can now -- we've
2       discussed everything that occurred on Monday,
3       January the 19th.
4    A. Yes, sir.
5    Q. Now, Tuesday, January the 20th.
6    A. Is when I came down.
7    Q. And about what time did you come, sir?
8    A. I don't know. I was out here as early as I
9       could be, because I wanted to get things
10      done. So it was early morning. I don't
11      remember, because I went -- started at
12      lawyers' offices and then I went to the
13      sheriff's office and then I was arrested at
14      the City.
15   Q. Who did you go see first?
16   A. I think I went to Julian McPhillips.
17   Q. Okay.
18   A. And I don't know who else I -- I don't
19      remember who else I went to, but I know I
20      went to them. And then I went to -- oh,
21      gosh. I don't remember who else it was. But
22      then I went -- but they told me to go down to
23      the County. They suggested I go down there

Page 207

1       and fill out some -- it was some form that
2       they said I could probably fill out to hold
3       the sale of the house, to keep them from
4       being able to sell the house. They said I
5       needed to fill that out first. And I went
6       looking and asking questions about how I
7       could get this form. Nobody could tell me
8       anything about that. Then they said I'd have
9       to -- if I got it, I'd have to have a judge
10      sign it to okay the hold on it. And so I
11      didn't get anywhere with that. And so I then
12      went to, like I said, the City after leaving
13      the County. And -- and --
14   Q. Now, did you actually go to the Sheriff's
15      Office in the --
16   A. Yes, sir.
17   Q. -- courthouse?
18   A. Uh-huh. Uh-huh. I talked to someone there,
19      and they told me that it was a civil -- it
20      was a civil matter.
21   Q. Do you recall who you spoke with?
22   A. No, I don't.
23   Q. And after leaving the County Sheriff's

Page 208

1       Department, where did you go, sir?
2    A. To the City.
3    Q. And who did you speak with there?
4    A. A Major Murphy. Oh, that was -- I'm sorry.
5       Let's see. That was -- yeah, that's when I
6       got arrested -- no, I'm sorry. I'm sorry.
7       I'm messing up, too. Major Murphy was after
8       all of this -- after this had happened. I
9       spoke to a young lady that was up there that
10      sits at the desk when you walk into the
11      locked door that they press. Okay. I went
12      in there to ask if I -- if she could give me
13      some idea of what I could do to talk to
14      somebody to take me over to the house. And
15      she informed me that they didn't do that.
16      She said we don't do that, sir. That's a
17      civil matter. But I can tell you this, which
18      I'm sorry to say, we are going to have to
19      detain you. And -- because there is a
20      warrant for your arrest.
21   Q. And about what time is that, sir?
22   A. That was that afternoon, I think. Well, no.
23      I spent about eight hours in there so it had

Page 209

1       to be that morning, because I stayed there
2       all day.
3            MR. ROUNTREE:  2:30.
4            THE WITNESS:  I think it was 12
5       something, wasn't it?
6            MR. ROUNTREE:  Yeah, 12:30. I'm sorry.
7            THE WITNESS:  Yeah. Okay. Yeah.
8    Q. All right, sir. Let me show you what has now
9       been marked Defendant's Exhibit #77 and ask
10      you what that is, sir.
11   A. That's the arrest report. When I went down
12      to City Hall, they informed me that I was
13      going to be detained, and it was because of a
14      warrant that had been filed charging me with
15      criminal trespass.
16   Q. All right, sir. And about what time was
17      that?
18   A. About 12:30 p.m. on the 20th of January.
19   Q. All right, sir. So what happened then when
20      they said they were going to have to detain
21      you?
22   A. They -- I -- I had my cell phone with me, so
23      I called Mr. Hardy again, Tom Mr. Hardy again

17 (Pages 206 to 209)

Dunn, King & Associates
toll-free (800) 359-8001                431 South Court Street
                                        www.dunnking.com
                                        Montgomery, AL 36104
                                        ph: (334) 263-0261; fax 263-1247

DEPOSITION OF THEODORE DAVIS
DAVIS v. ARMSTRONG RELOCATION, LLN., ET AL.

June 17, 200

Page 210

1  and informed him that they were going to put
2  me in jail.
3  Q.  And that cell phone number is?
4  A.  His -- his number.  His number was 2 -- his
5     number was 288-6 -- 8607.  288-8607.
6  Q.  Is that 334?
7  A.  Yes, sir.  And he -- that's his number.  And
8     that's where I called for him to come and get
9     me.  And that cell phone number that you have
10    there is the number I called from, this one
11    here.
12 Q.  Would be area code 205?
13 A.  Yes, sir.
14 Q.  790-3457?
15 A.  Uh-huh.
16 Q.  Which is the account at Verizon?
17 A.  Mary Drake, uh-huh.
18 Q.  And about what time did he arrive?
19 A.  I'm assuming it took -- at least five or six
20    hours I was there.
21 Q.  Did they -- where did they -- where were you?
22 A.  I was in a holding cell.  They took
23    fingerprints and pictures and all of this

Page 211

1  stuff, I'll tell you.  And it was
2  embarrassing.
3  Q.  While you were there, did you see anyone that
4     you knew?
5  A.  No, sir.
6  Q.  Has anyone told you that they saw you there?
7  A.  No, sir.
8  Q.  And Mr. Hardy arrives and what happens then?
9  A.  He paid the $500 bail and then we had to wait
10    for a while until the paperwork, because he
11    said he had sat down there waiting for that
12    for a couple of hours waiting for them to go
13    through that procedure.  And after that was
14    cleared, then they told me I -- they came and
15    got me and gave me my clothes and all of my
16    belongings and told me that I could go.  And
17    so I left with him.
18 Q.  And about what time was that?
19 A.  It was late that afternoon.  I don't remember
20    the time.
21 Q.  Had it already gotten dark?
22 A.  I don't remember whether it had or not.
23 Q.  All right.  Where did you go, sir?

Page 212

1  A.  I went back to his house.  Went back over to
2     his house.  I got my car and followed -- and
3     followed him.
4  Q.  All right.  And how long were you there at
5     Mr. Hardy's house?
6  A.  I think I spent the night that night, if I'm
7     not mistaken.
8  Q.  And then what -- what did you do the next
9     day?
10 A.  I went to try to get him the money to pay him
11    back, because he had -- the $500, and I went
12    and got some money to pay him back.
13 Q.  All right.  Now, is this -- does that bring
14    us up to Wednesday, January 21st?
15 A.  Yes, sir.
16 Q.  Okay.  So where did you go to try do get the
17    money to pay Mr. Hardy back?
18 A.  I went to the credit union, to the bank.
19 Q.  And which credit union?
20 A.  Maxwell.
21 Q.  And were you successful?
22 A.  Yes, sir.  I had it.  It was in my account.
23    So I had it.

Page 213

1  Q.  And that's where you do your banking?
2  A.  Yes, sir.
3  Q.  And the account name is?
4  A.  In Theodore Davis.
5  Q.  Were you using that address of Rosedon Drive?
6  A.  Yes, sir.
7  Q.  Did he ask for a cashier's cash or did you
8     get him a cashier's check?
9  A.  Who is that, now?
10 Q.  Mr. Hardy.
11 A.  Oh, no.  No.  I just gave him -- gave him the
12    cash.
13 Q.  All right.  And then what happened, sir?
14 A.  I -- I guess it was just a regular day of me
15    trying to figure out what was going on.  I
16    don't know what -- I don't know what else I
17    did after that.
18       MR. ROUNTREE:  Did you go to the city
19       dump?
20       THE WITNESS:  I don't think that was
21       that day.  I don't remember when I
22       went to the city dump.  I went to
23       the city dump the day that --

18 (Pages 210 to 213)

Dunn, King & Associates          431 South Court Street          Montgomery, AL 3610
toll-free (800) 359-8001         www.dunnking.com               ph: (334) 263-0261; fax 263-1

FOSHEL & TURNER COURT REPORTERS

Page 1

1

2       IN THE CIRCUIT COURT

3   OF MONTGOMERY COUNTY, ALABAMA

4

5   THEODORE DAVIS,

6                                   Plaintiff,

7            - against -

8   GREYHOUND LINES, INC.,

9                                   Defendant.

10

11                              March 3, 2006

                              2:00 p.m.

12

13          Deposition of EDNA SIRENA DUMAS, taken by

14   Defendant, pursuant to notice, at the New York

15   Palace Hotel, 455 Madison Avenue, New York, New

16   York, before SUZANNE PARKER, a Shorthand Reporter

17   and Notary Public within and for the State of New

18   York.

19

20

21

22

23

24

25

FOSHEE & TURNER COURT REPORTERS

Page 5

1

2          Q.     And that began in approximately

3    1994?

4          A.     1994.

5          Q.     And since that you had a

6    boyfriend/girlfriend type relationship?

7          A.     Yes, we did.

8          Q.     And did something occur at some point

9    in time where that boyfriend/girlfriend type

10   relationship changed?

11         A.     Yes, it did.

12         Q.     Tell the court what that was, please,

13   ma'am.

14         A.     It -- well, I came to Alabama to

15   visit him in August of 2001, and prior to that we

16   were on the phone, constantly on the phone a

17   lot.  And in September of 2001 he stopped, like,

18   slacked off calling.  And then he said your cell

19   phone isn't working so I'm not going to call

20   you.

21                So at that time my daughter Kimberly

22   called him and said, you know, you really should

     call my mom.  You know how she works, she works a

     lot of hours and the phone cannot pick up in all

     of the areas that she works in because of the

FOSHEE & TURNER COURT REPORTERS

Page 36

1

2          Q.      I think you said earlier that you

3    owned a home at 207 Roselane, is that correct?

4          A.      That is absolutely correct, yes,

5    sir.

6          Q.      Do you still own that property?

7          A.      Yes, I do.

8          Q.      Is it for sale at this time?

9          A.      Yes, I did put it up for sale.

10          Q.      When did you put it up for sale?

11          A.      On the 22nd of January 2004.

12          Q.      Who lived in that house from 1994

13    until the end of 2003?

14          A.      Theodore Davis.

15          Q.      Did anyone other than him live

16    there?

17          A.      I guess his women.  When I come

18    visit, everything would be nice.  I mean, nothing

19    would be visible for me to see.

20          Q.      So you didn't see anything that was

21    visible that anyone else was living there?

22          A.      Except Kotex and Tampons.  And hair

23    dryers.

24          Q.      Did you see anything else that would

25    indicate someone else was there?

FOSHEE & TURNER COURT REPORTERS

Page 37

1

2      A.     No, sir.

3      Q.     Did Mr. Davis ever pay you any rent?

4      A.     No, sir, he did not.

5      Q.     So he never paid you any rent at all

6   from 1994 through at least January of 2004, is

7   that correct?

8      A.     That's correct.

9      Q.     Were you purchasing that house at

10  that time?  Were you making any payments?

11     A.     I paid for that house.

12     Q.     So it was paid for.

13     A.     I paid for that house.

14     Q.     Did you have any kind of agreement at

15  all with Mr. Davis as far as the payment of

16  rent?

17     A.     You know what?  He was so strapped

18  when he came to live in my house because he said

19  that they were just coming back off a strike from

20  Greyhound.  So he was so strapped, I didn't even

21  pressure him and I didn't even bother him.  So he

22  said in August of 2003 when I get my money, I'll

23  pay you what I owe you.  When I get my money from

24  Greyhound.

25     Q.     So he said he'd pay you what he owed

FOSHEE & TURNER COURT REPORTERS

Page 38

you.

    A.    When he'd get his money from Greyhound.

    Q.    What did he owe you?

    A.    I charged him — if I was charging him $500 a month for ten years, that would be like $80,000.

    Q.    Did he owe you?

    A.    You know what? I tried to help Mr. Davis out of the kindness of my heart and it turned into something like this.

    Q.    Did he owe you?

    A.    You know what? How I felt about it, let him take it and go on and have a happy life.

    Q.    Can you again tell me the date that you came to the property to ask Mr. Davis to leave?

    A.    January 19th, 2004.

    Q.    Are you sure it wasn't February 19th, 2004?

    A.    Absolutely not. I'm certain that it was January 19th, 2004. February 19th he was not in possession of my house. A "for sale" sign was in the yard.

FOSHEE & TURNER COURT REPORTERS

```
 1
 2          Q.     Did you or your friends eat any of
 3    the food that was in that home?
 4          A.     No, sir.
 5          Q.     Did you or your friends use any of
 6    the furniture that was in that home?
 7          A.     No, sir.
 8          Q.     What did you do with the food that
 9    was in that home?
10          A.     Put it out in the garbage.
11          Q.     What did you do with the furniture
12    that was in that home?
13          A.     First of all, let me tell you about
14    the furniture.  All that furniture was not his
15    furniture.  Regardless of what he's saying, it
16    was not.
17          Q.     Who did it belong to?
18          A.     It was my furniture.
19          Q.     All of it?
20          A.     Not all of it.  But enough of it.
21          Q.     Is some of it his?
22          A.     Yes.  One or two pieces.  Not enough
23    to even talk about.  And it was all broken down
24    and raggedy.
25          Q.     Did you or your friends remove any of
```

FOSHEE & TURNER COURT REPORTERS

Page 42

1

2    that furniture and put it in the yard?

3        A.    Did me or my friends, no, I did not

4    touch it.  Nor did my friends touch it.

5        Q.    Who put the furniture outside?

6        A.    The moving company.

7        Q.    And did you hire that company?

8        A.    Yes, I did.

9        Q.    What's the name of that company?

10       A.    I don't have the papers here with me

11   now.

12       Q.    You don't remember the name of the

13   moving company?

14       A.    Absolutely not.

15       Q.    Did you know any of the people that

16   worked for that moving company?

17       A.    I don't know nobody.  I didn't know

18   any of them.

19       Q.    You didn't know any of the people

20   that worked for that moving company at all?

21       A.    Not at all.

22       Q.    Did your nephew or son know any of

23   the people that worked for that moving company?

24       A.    First of all, my son wasn't in the

25   area.  My nephew was in the area.  He didn't know

FOSHEE & TURNER COURT REPORTERS

Page 43

1
2    anybody.

3        Q.    How many people came to remove the

4    belongings from the house?

5        A.    Two.

6        Q.    Did they remove everything that was

7    in there that was his?

8        A.    Listen, the police told him to take

9    what he wanted to take.  He took what he wanted

10   to take.  He called the police on me and the

11   police told him to take what he wanted to take

12   and he took what he wanted to take.

13       Q.    Did the police officer give him only

14   five minutes to take his items out of the house?

15       A.    No, sir.  They gave him longer than

16   five minutes.

17       Q.    How many minutes?

18       A.    Actually, the police said I think

19   I've been here an hour now or more, let's see if

20   he's ready to go.  And I don't know what he told

21   the police.

22       Q.    He was living there for ten years and

23   he was given an hour?

24       A.    But you have to understand everything

25   in that house was not his.

1
2     anybody.
3         Q.    How many people came to remove the
4     belongings from the house?
5         A.    Two.
6         Q.    Did they remove everything that was
7     in there that was his?
8         A.    Listen, the police told him to take
9     what he wanted to take.  He took what he wanted
10    to take.  He called the police on me and the
11    police told him to take what he wanted to take
12    and he took what he wanted to take.
13        Q.    Did the police officer give him only
14    five minutes to take his items out of the house?
15        A.    No, sir.  They gave him longer than
16    five minutes.
17        Q.    How many minutes?
18        A.    Actually, the police said I think
19    I've been here an hour now or more, let's see if
20    he's ready to go.  And I don't know what he told
21    the police.
22        Q.    He was living there for ten years and
23    he was given an hour?
24        A.    But you have to understand everything
25    in that house was not his.

FOSHEE & TURNER COURT REPORTERS

Page 44

1

2      Q.    Were there things that were left in

3    that house that were his?

4      A.    His family came and took things that

5    belonged to him.  They took everything that

6    belonged to him.  When it went on the street --

7    when I put it out, his daughter came, his baby's

8    mama came, three trucks came and they picked it

9    up.  And the police was present when they were

10   doing that.  And Mr. Davis knows that the police

11   spoke to him at that time because he called them

12   and they told him, they said look, the police

13   told him your family is getting your stuff, it's

14   okay.  So his family took.  They had like four

15   trucks and they took everything of his.

16     Q.    What was the police officer's name?

17     A.    I'm sorry, I don't know.

18     Q.    Did you know that police officer

19   before?

20     A.    I have never seen any of these people

21   in my life.

22     Q.    Did you produce the deed to that

23   police officer?

24     A.    Yes, I did.

25     Q.    And you just don't happen to know his

FOSHEE & TURNER COURT REPORTERS

Page 45

 1
 2    name, is that correct?
 3         A.    I don't know.  Mr. Davis called the
 4    police every day three times.  I don't know the
 5    police name.
 6         Q.    Did you ask the police officer to
 7    remove Mr. Davis from the house?
 8         A.    Mr. Davis called the police to remove
 9    him from the house.  I didn't ask him.
10    Mr. Davis --
11         Q.    You're saying that Mr. Davis called
12    the police in order to have himself removed from
13    the house?
14         A.    That's what happened.  He called
15    them.  I didn't.
16         Q.    And did you ask that officer to
17    remove him from the house?
18         A.    Mr. Davis got his self removed from
19    the house.  I didn't call the police.  Mr. Davis
20    called the police.
21         Q.    Once the police were there, did you
22    ask them to remove Mr. Davis from the house?
23         A.    Mr. Davis said that he had some
24    rights and he was going to stay.  And I said to
25    the police one of us is going to stay.  Mr. Davis

FOSHEE & TURNER COURT REPORTERS

Page 46

2    had a food stamp letter and I had the deed.  So

3    that's the way it went.  He called the police.

4         Q.    How much time did you give him to get

5    his items together before he was required to

6    leave?

7         A.    How much time did I give him?

8         Q.    Right.

9         A.    He had all the time he wanted to

10   have.  He had his things packed.  He had a bag

11   packed.  At that time when I came in he said he

12   was going to work.  So he had some clothes

13   packed.  And I did not bother him.  I sat in the

14   front room and he took his time.  I didn't rush

15   him.

16        Q.    Did he obtain most of his papers or

17   records or address books?

18        A.    That's all -- understand what he was

19   taking was papers and addresses -- I don't know

20   about addresses but he was getting all his papers

21   and he left there with quite of bit of stuff.  He

22   and his friend.  His friend came to help him.

23        Q.    Who was his friend that came to help

24   him?

25        A.    He said his name is Tommy.

FOSHEE & TURNER COURT REPORTERS

Page 48

1

2          Q.    Did you make sure that he got that

3    stub?

4          A.    I never seen him anymore.  How am I

5    going to make sure that he get that?

6          Q.    Did you or any of your friends review

7    any of the videos belonging to Mr. Davis that

8    were in that house?

9          A.    Look, the videos that were out there

10   I did not have time to look at those things.  I

11   just wanted to get them to his family and let

12   them see them.  Let them go ahead with them.  But

13   I did get a call that his daughter saw some of

14   the videos.  I'm not interested in that stuff,

15   you know?

16         Q.    Did you review any of them?

17         A.    No, sir, I did not.

18         Q.    Did any of your friends?

19         A.    His family.  Okay?

20         Q.    Did you give them to his family?

21         A.    I just put everything out there.  I

22   was not interested in -- I just wanted them to

23   get the stuff and go.

24         Q.    You put the videos and the other

25   business papers out on the street, is that

FOSHEE & TURNER COURT REPORTERS

Page 49

1

2    correct?

3        A.    Yes.   Absolutely.   His daughter was

4    there.   She was taking them and all of his

5    family.   So they had them.

6        Q.    Have you discussed any of his

7    personal business, either videos, business

8    papers, with anyone other than Clay Clark?

9        A.    Have I discussed it with anyone other

10   than?

11       Q.    Other than Clay Clark.

12       A.    With his sister.

13       Q.    That's the lawyer sitting across from

14   you now.

15       A.    Yes.

16       Q.    Who did you discuss it with?

17       A.    With his sister, for one.

18       Q.    Anyone else?

19       A.    There were people out there that saw

20   all of that stuff.   It was out there.

21       Q.    Well, I just want to know if you

22   discussed it with anyone else.

23       A.    Sure.

24       Q.    Who did you discuss it with?

25       A.    With my son, with my daughter.

1

2    written down but it was so many, I don't have

3    them with me.  If I had known that you would want

4    them, I would have brought them.

5          Q.    Have you ever signed a warrant

6    against anybody?

7          A.    Against Theodore Davis.

8          Q.    And what was that warrant for?

9          A.    Because the police asked him not to

10   come back to that property, don't come back to

11   this property.  And he came back.

12         Q.    Did the police do this of their own

13   volition or at your request?

14         A.    At their -- I mean, he kept calling

15   them and what they were telling him to stay away,

16   stay away, stay away.  And it wasn't --

17         Q.    He called the police --

18         A.    He kept calling them.

19         Q.    They said stay away.

20         A.    The police said stay away.

21         Q.    How could he get his furniture and

22   belongings that were on the street?

23         A.    His family came down and they picked

24   them up.  His daughter was there.  He had like

25   four trucks.

FOSHEE & TURNER COURT REPORTERS

Page 54

1

2      Q.    Was Mr. Davis arrested because of

3  your complaint?

4      A.    Yes, he was.

5      Q.    You signed a warrant for his arrest,

6  is that correct?

7      A.    That's correct.

8      Q.    You made a complaint, did you not?

9      A.    Yes, I did.

10      Q.    Did you and Mr. Davis ever live

11  together?

12      A.    We never lived together but he was

13  with me, I was with him, we were back and forth,

14  back and forth, back and forth and back and

15  forth.

16      Q.    I think you testified earlier that

17  that was three or four times a year, is that

18  correct?

19      A.    Uh-huh.  And he had my things in his

20  house -- in my house.  He had my things.  I

21  practically furnished that house.  And what

22  belonged to him his family took.

23      Q.    But you only visited with him three

24  or four times a year, is that correct?

25      A.    Yes.

Combined Uniform Household Goods Bill of Lading and Freight Bill

## ARMSTRONG RELOCATION

6411 ATMORE ST.
MONTGOMERY, AL 36117

No. Y 6002 4

| | | | |
|---|---|---|---|
| Name Eddie Wood | Tel. | | TIME RECORD |
| From 4017 Boscobia Drive | Apt. | | Start |
| Prattville AL 36066 | | | Finish |
| To | Apt. | | TOTAL HOURS |
| Other Stops | | | TRAVEL TIME |
| | | | TOTAL HOURS |
| Moving Date 1/19/04  Day  Time | | | |

| ESTIMATE OR REMARKS | DETAILS AND DESCRIPTION | CHARGES |
|---|---|---|
| | MOVING | |
| | OVERTIME | |
| | CARTAGE | |
| | WEIGHT | |
| | PADDING | |
| | 3/8 HRS | |
| | | |
| | Whse chgs. | |
| | Storage chgs. | |
| | Other | |

CUSTOMER Eddie Wood
BY

MOVER ARMSTRONG RELOCATION
BY

### DELIVERY RECEIPT
Except as specifically endorsed hereon,
All services and affidavits received in Good Condition

CUSTOMER Eddie Wood
BY

Amt. $        @ $        per $100.00

Receipt #

TOTAL CHARGES
Advance Deposit
BALANCE DUE

### RECEIVED PAYMENT
MOVER ARMSTRONG RELOCATION    cash
BY

MOVER'S (Carrier) COPY      TERMS: Charges Payable in Cash, Money Order or Certified Check on Delivery